**COMMISSIONER OF the DISTRICT OF COLUMBIA, and Walter E. Washington, et al., Appellants,**

**v.**

**Charles B. BENENSON et al., Appellees.**

**No. 8572.**

District of Columbia Court of Appeals.

Argued Sept. 11, 1974.

Decided Dec. 10, 1974.
Rehearing and Rehearing en Banc Denied Feb. 20, 1975.

Louis P. Robbins, Principal Asst. Corp. Counsel, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, Richard W. Barton and David P. Sutton, Asst. Corp. Counsels, Washington, D. C., were on the brief, for appellants.

J. Hampton Baumgartner, Jr., Washington, D. C., with whom Bruce S. Mencher, Washington, D. C., was on the brief, for appellees.

Before KELLY, KERN and GALLAGHER, Associate Judges.

GALLAGHER, Associate Judge:

The owners of the Willard Hotel on Pennsylvania Avenue in this city (appellees) (sought an injunction in the trial court to compel the issuance of a permit authorizing the removal of all nonstructural elements of the hotel. The trial court in a memorandum opinion granting summary judgment in favor of the hotel owners ordered the issuance of a permit "to demolish the non-structural elements" of the hotel. We affirm.

The Willard Hotel has been vacant and boarded up for several years. The owners applied for a permit to demolish the non-structural elements of the hotel. The Chief of the Permit Branch in the Bureau of Licenses and Inspections submitted the application to ·the Commission of Fine Arts,[1] apparently because the building is located in the Shipstead-Luce Act (the Act)[2] area of the city.[3] Under this Act, insofar as pertinent, it is the duty of the

---

1. 40 U.S.C. § 104 (1970).

2. D.C.Code 1973, § 5-410; 40 U.S.C. § 121 (1970).

3. This geographical area in the city includes Pennsylvania Avenue between the Capitol and the White House.

Fine Arts Commission to make recommendations to the Mayor-Commissioner of the District of Columbia on applications for permits for the "erection or alteration" of any building in certain areas of the city including the portion of Pennsylvania Avenue where this hotel is located. The Fine Arts Commission made this recommendation:

Do not issue Permit:

Removal of exterior architectural features of this *historic landmark* is not recommended. Defacing or incompatible *alteration of this facade* is not in the public interest. (Emphasis added.)[4]

Upon being advised by the Chief of the Permit Branch that the permit would not be issued the owners appealed to the Mayor-Commissioner (appellant). The Mayor-Commissioner later by letter advised the owners that a permit would be authorized "for removal of existing nonstructural interior partitions, ceilings, plumbing and electrical elements" but a permit for "removal of 'nonstructural elements of all facades'" was denied.[5] The owners then filed suit in the trial court to compel issuance of the permit sought.[6]

In pertinent part, the Shipstead-Luce Act provides:

[T]he planning and development of the capital city . . . should proceed along the lines of good order, good taste, and with due regard to the public interests involved, and a reasonable degree of control should be exercised over the architecture of private or semi-public buildings adjacent to public buildings and grounds of major importance. To this end, when application is made for permit for the erection or alteration of any building, any portion of which is to front or abut . . . the portion of Pennsylvania Avenue extending from the Capitol to the White House . . . the plans therefor, so far as they relate to height and appearance, color, and texture of the materials of exterior construction, shall be submitted by the commissioner of the District of Columbia to the Commission of Fine Arts; and the said commission shall report promptly to said commissioner its recommedations, including such changes, if any, as in its judgment are necessary to prevent reasonably avoidable impairment to the public values belonging to such public building or park . . . .

It is important to say at the outset that the government acknowledges the right of the owners to raze the entire structure. But, says the government, the owners "proposal to strip the Willard Hotel down to its skeletal frame constitutes an 'alteration' within the purview of that Act." In fact, continues the government, the Fine Arts Commission specifically characterized the "proposed action as an 'incompatible alteration of this [the Willard Hotel's ] facade' and as such 'not in the public interest.' " It is contended that the ultimate issue before us is whether there is a reasonable basis for the Commission's interpretation of the Shipstead-Luce Act; and that, if so, the trial court erred in overturning it. We think this statement of the issue is probably fair enough, though the Commission affords us no reasoning leading to this administrative interpretation which normally should be available to us. It is one thing to remind an appellate court of the familiar rule that an agency's interpretation of its regulations and the statute it administers is entitled to deference but this is not

---

4. As the government says, "this case involves a unique application of the Shipstead-Luce Act."

5. He went on to say that if after exploration necessary for preparation of drawings for "remodeling" the building it develops that this cannot reasonably be accomplished without removal of "some of the exterior facade" the application would be reconsidered upon a "showing accompanied by appropriate plans."

6. We granted a stay of the trial court's order to permit resolution of this novel issue on appeal as the demolition might possibly have taken place in the meanwhile.

**440**

to say the agency need not lay open the reasons behind its interpretation.

Tracing the responses to the permit application by the Fine Arts Commission, the Permit Branch and the Mayor-Commissioner reveals a thread which led the government to an erroneous conclusion.

In recommending against issuance of the permit the Fine Arts Commission said:

*Defacing or* incompatible *alteration* of this *facade* is not in the public interest. (Emphasis added.)

The Permit Branch later stated to the owners:

The Fine Arts Commission has responded to your application for permit *to remodel* the Willard Hotel as follows:

. . . [U]nless you present plans for the *exterior treatment of this structure* that are acceptable to the Commission of Fine Arts, a permit will not be issued. (Emphasis added.)

This was followed by the letter ruling from the Mayor-Commissioner denying the permit, which said:

If it develops . . . that exploration essential to preparing necessary drawings for *remodeling* the building cannot reasonably be accomplished without removal of some of the exterior facade, I would, upon such a showing accompanied by appropriate plans, be happy to reconsider your application. (Emphasis added.)

■ The difficulty with these governmental responses is they treat the hotel owners' application as an effort to secure permission to remodel the Willard in some fashion or change its facade. This is not the situation. The owners wish a permit to demolish the hotel down to the steel

7. If so, this might well effect a substantial saving in erecting a new building.

8. Unlike in the Old Georgetown Act, Congress did not include the term "razing". *See* D.C.Code 1973, § 5–802.

girders and joists. The structural foundation and iron work are to be retained for use in erecting a new building, if upon exploration their retention proves feasible.[7] This would hardly be a remodeling operation nor would it be a change in the facade of the Willard Hotel. Demolition of the hotel's facade would not alter it—the facade would be obliterated.

■ Under the Shipstead-Luce Act, the function of the Fine Arts Commission is confined, essentially, to recommendations concerning applications for permits for "the *erection* or *alteration* [8] of any building [within the prescribed area of the city] . . . so far as [the plans therefor] relate to *height* and *appearance, color,* and *texture of the materials of exterior construction* . . . ."[9] (Emphasis added.)

■ What the problem comes down to is whether what the owners seek to do is an "alteration" of the "height and appearance, color and texture of the materials of exterior construction" of the hotel. We think not. We think the Fine Arts Commission, the Permit Branch and the Mayor-Commissioner were incorrect in considering the application as a request for "alteration of [the] facade", or for "remodeling" of the building, or as a plan for the "exterior treatment of [the] structure." It was *neither* of these. Rather, as the trial court put it, the owners "seek to demolish all but the girders and joists and *then* construct a new building using the structural foundation and iron work of the old building. Once [the owners] have prepared the plans and want to begin construction of the new building, they will submit the plans for the Commission's approval or recommendations."[10] (Emphasis in text). As the trial court said, the word "alteration" in the Act "means change in the

9. D.C.Code 1973, § 5–410; 40 U.S.C. § 121 (1970).

10. Memorandum Opinion of Trial Court at 8.

sense of adding to, remodeling or reconstruction."

While the application for a permit does not go to a "razing" in the usual total sense, we think that for the purposes of the Act the result is the same since the governmental control is confined only to the *exterior appearance* of buildings. Here, the exterior appearance would be removed, not altered, by demolition. It will be recalled at this point that the government freely concedes the owners have a right to raze the entire structure, which viewed realistically, brings into focus the error of the government's position. Where we diverge from the government is when it takes the position that the owners "do not seek demolition" but rather "seek to alter the building." The reach of the Act extends only to exterior appearance and, as to this, there will be a demolition.

The government says the owners have a perfect right to raze the building but only if they go all the way and demolish the steel girders in the process, and then erect a new building. This position is not very realistic—all other considerations aside.

█ In our view of the Act, the construction of it given here by the Fine Arts Commission is not "such a reasonable official interpretation . . . of the Commission's authority as to preclude judicial repudiation." Stanley Company of America v. Tobriner, 111 U.S.App.D.C. 404, 407, 298 F.2d 318, 321 (1961). After giving the administrative interpretation the due respect to which it is entitled [11] Cook v. James E. Griffith, Inc., D.C.App., 193 A.2d 427, 428 (1963), our difference with it is to a degree requiring us to consider it clearly wrong.

It is not as though the Fine Arts Commission will not be able to exercise its responsibility on the appearance of any new structure to occupy that architecturally significant corner in this city. The Commission certainly will, as the plans must be submitted to it before construction begins. Especially because of the location of this particular site the Commission would doubtless be as discriminating as the site demands in the matter of any future structure's appearance.

There may well be those who think it lamentable that this handsome old hotel may soon be demolished.[12] Retention of fine architecture, especially in the capital city of a relatively young country such as ours, lends a certain stability and cultural conti-

---

11. Though there is involved here construction of a statute, rather than an administrative regulation, the administrative interpretation is nevertheless entitled to deference where, as here, it is the responsibility of the officers or agency to administer the particular statute. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

12. It recently has been written that:

Presidents, Vice Presidents, diplomats and society leaders have stayed at the Willard, the hotel where Julia Ward Howe wrote "The Battle Hymn of the Republic" and where Calvin Coolidge established a temporary White House for three weeks after the death of President Harding. So intertwined was the Willard with the life of the nation's capital that Nathaniel Hawthorne once said it "could more justly be called the center of Washington than either the Capitol or the White House."

&ast; &ast; &ast; &ast; &ast;

. . . [T]he present 12-story elegant Beaux-Arts structure by Hardenbergh, [who

also designed the Plaza Hotel in New York City], [was designed] in 1901 . . . . Its rich Beaux-Arts eclecticism is rare enough in New York; it is virtually unequaled in Washington. (New York Times, November 6, 1974, at 62.)

It was also said that:

[Though] the owner . . . wants to . . . recover the Willard's steel skeleton with a glass curtain wall—making the building, in effect, a modern skyscraper . . . [this] comes at a time when restoration prospects seem brighter than they have at any time since the hotel was closed . . . . The National Trust for Historic Preservation wants the building restored as a hotel, and has just completed a study that concluded that such a project could be economically feasible . . . . A bill authorizing an appropriation [to purchase the hotel as a residence for Congressional internes] is pending before the House . . . . The Pennsylvania Avenue Development Corporation, the new coordinating agency for Pennsylvania Avenue, is at

.. 

442

nuity, which can only contribute over the years to national substance. If one looks at the architecture of a city and sees only the present, the feeling of character is missing. Once the earlier architecture is demolished there is no retrieving it.

This is not the problem for us, however. We consider that, as matters stand, to deny the requested permit would raise the spectre of a taking without due process of law. The judgment of the trial court is consequently

Affirmed.

the forefront of the battle to retain the hotel . . . . And the Intercontinental Hotel Corporation . . . has expressed an interest in operating a restored Willard. *Id.*

*From this it would appear there is considerable interest in retaining this structure,* whose architecture "seems to captivate Washington," and thereby preserve the hotel which in its heyday was so expensive that it prompted then "Vice President Thomas R. Marshall, a hotel resident," to make his callow yet pungent, if not sadly prophetic, remark that "[w]hat this country needs is a good 5-cent cigar." *Id.* This kind of hotel with that kind of history deserves to be left standing and reinfused with the life of this generation —if this is legally possible.