Charles B. BENENSON et al.

v.

The UNITED STATES.

No. 368–75.

United States Court of Claims.

Jan. 26, 1977.

940

J. Hampton Baumgartner, Jr., Washington, D. C., for plaintiff; Stanley J. Fineman, Michael B. McGovern, Wilkes & Artis, Washington, D. C., of counsel.

Dorothy R. Burakreis and Hubert M. Crean, Washington, D. C., with whom was Asst. Atty. Gen. Peter R. Taft, Washington, D. C., for defendant.

Before COWEN, Chief Judge, and DAVIS and BENNETT, Judges.

## ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY AND DEFENDANT'S OPPOSITION THERETO

COWEN, Chief Judge:

This is a suit to recover just compensation for the inverse condemnation of the historic Willard Hotel in Washington, D.C. Plaintiffs claim that the actions of the United States have so interfered with the use and enjoyment of their property as to constitute a complete taking of the fee interest, for which compensation is due under the Fifth Amendment. The facts essential to the disposition of the case on plaintiffs' motion are not in dispute. For reasons to be set forth, we agree with plaintiffs that a taking of their entire fee interest has occurred and remand the case to the trial division to determine the date of the taking and the amount of the compensation due plaintiffs.

### I.

At all times pertinent to this case, plaintiffs have been the owners of the land and improvements located at 1401 Pennsylvania Avenue, N.W., Washington, D.C., on lot 32, square 225; the improvement is a large, vacant building known as the Willard Hotel, having frontage on Pennsylvania Avenue, N.W., 14th Street, N.W., and F Street, N.W. The record title to the land and improvements is held by Charles B. Benenson and Robert H. Arnow, as tenants in common, each having a 50 percent interest; The Benenson Capital Company is the owner of a beneficial interest in the land and improvements.

Plaintiffs purchased the Willard Hotel on September 29, 1961, for $3,000,000; simultaneously with this purchase, they leased the land back to the sellers for 99 years and the lessees continued operation of the Willard as a hotel until 1968.

Active Governmental involvement in the area encompassing the Willard Hotel (between the White House and the Capitol on the north side of Pennsylvania Avenue, N.W.) commenced in 1962, with the creation of the President's Advisory Council on Pennsylvania Avenue, which prepared a master plan in April 1964 for this area. This plan called for the demolition of the Willard and other structures in square 225 to make space for a "National Square," as a ceremonial gateway to the White House. The Advisory Council was replaced by the Temporary Commission on Pennsylvania Avenue (Commission) established by Presidential Order on March 25, 1965. The Commission's activities, limited in nature, were primarily to advise the President on aspects of implementing and coordinating the plan with the National Capitol Planning Commission, proposing legislation, and promoting public understanding of the program for Pennsylvania Avenue and its objectives.

The Commission's first efforts were directed toward seeking legislation affording the Commission more permanent status and inducing the Secretary of the Interior to designate the Pennsylvania Avenue area as a national historic site. On September 30, 1965, pursuant to the authority of the National Historic Sites Act of 1935, 16 U.S.C. §§ 461, et seq., Secretary of the Interior Udall signed an order of designation establishing the Pennsylvania Avenue National Historic Site. At that time, the Order contained a restriction that: "Unless provided otherwise by Act of Congress, no funds appropriated to the Department of the Interior shall be expended for the administration, protection and development of the Pennsylvania Avenue National Historic Site."

While this official designation did not bring the Government closer to ownership or administration of the area, the actual and intended effect of the designation was to create a Federal presence in the area,

one which has continued and steadily grown to the present. The designation by the Department of the Interior was viewed as necessary to give impetus to the announced plan for the avenue while congressional action on pending enabling legislation was awaited. · In a memorandum dated June 21, 1965, to Secretary Udall, the Deputy Solicitor of the Department of the Interior explained the purposes and objectives of the order designating the Pennsylvania Avenue area as a national historic site as follows:

Declaration of the Pennsylvania Avenue area as a National Historic Site can accomplish more than the initial objectives specified by Chairman Owings. The declaration, of itself in one action, establishes the *Federal presence over the area.* It provides the base from which specific planning and implementation may proceed.

By virtue of the broad contractual authority (pages 8–9, *supra*), *necessary restraints on land use* may be imposed upon what might otherwise be haphazard [development] notwithstanding new development within the site while detailed planning goes forward and any necessary legislation is developed.

Under the provisions of the act, for example, less than fee interests in lands may be acquired. (16 U.S.C. § 462(d)). This may be a method whereby undesired growth is checked. Contractual authority is, in this instance, backed by two powerful forces: *latent condemnation authority,* and moral-patriotic pressures. After immediate objectives are reached, the long-range necessity remains of maintaining the area in no less a condition than that which renders the completion of the entire plan feasible. A *"freeze"* can be effected on such development as would otherwise be inconsistent with the Plan. [Emphasis supplied.]

Through 1966, operation of the Willard by plaintiffs' tenant continued; nothing dramatic occurred with regard to the avenue plan. Little progress had been made by the Commission beyond securing designation of the avenue area as an historic site.

Nevertheless, by the fall of 1967, plaintiffs were more interested in disposing of the Willard to the Commission than in investing further in a structure for which demolition loomed; the lessee, operator of the hotel, was also anxious for this resolution since the hotel was not profitable and defaults in the payment of rentals to plaintiffs were likely. On October 4, 1967, members of the Commission staff met with the Administrator of the General Services Administration (GSA) and his deputy; the purpose of the meeting was to discuss ways of acquiring the Willard. The possibility of a trade for the Willard was mentioned.

As a result of this meeting, the Deputy Administrator of GSA submitted to plaintiff Benenson a list of surplus Federal properties which might be considered suitable for a trade. The Government only broached, at this point, the subject of acquiring the Willard by means of trade, since no funding was available for any other means of takeover. No direct discussion of eminent domain entered into these negotiations. The submission of the list was the first step in what was to become a long and sporadic series of negotiations between GSA and plaintiffs over a 5-year period. Despite repeated attempts, the parties were not able to come to terms and no trade resulted. Congressional opposition at various times during these years was an added barrier.

During the negotiations, the GSA felt that its efforts to acquire the Willard could only be justified if the property were to be turned over to the Department of the Interior for administration by the Park Service, pursuant to the National Historic Sites Act of 1935. This proposal, which would utilize the authority of GSA to trade surplus property, could be accomplished without action by Congress, since it involved no expenditure by the Park Service and required no appropriation. Therefore, the Commission wrote to the National Park Service to suggest that it formally request action by the GSA, as a means of validating the exchange negotiations.

In July 1968, the Willard Hotel ceased operations; the tenant was unable to pay for improvements that were necessary to make the hotel viable and competitive. Millions of dollars in capital expenditures would have been required to put the building in operating condition. Replacement of the heating plant, plumbing system, electrical wiring, the installation of new elevators, and the purchase of new room furnishings and furniture were some of the major items needed for competitive hotel operation. Occupancy at the hotel, and hence income, were very low. The lessee could not economically continue to operate the hotel and pay rent to plaintiffs. Consequently, the plaintiffs paid the lessee $250,000 for the remainder of the leasehold and cleared title to the building. These events naturally stirred the Commission's hopes of acquiring the hotel and obtaining plaintiffs' cooperation in implementing the National Square project. Nonetheless, the Commission wished to press forward with an exchange lest the situation evolve to a point where plaintiffs might desire the development of the building and site in a manner inconsistent with the plan.

At the Commission's request, the Secretary of the Interior urged the Administrator of GSA to complete exchange negotiations for the Willard as soon as possible. His letter of October 24, 1968, stated in part:

It is contemplated that the area bounded by Pennsylvania Avenue, F Street, 14th Street and 15th Street, which includes the Willard Hotel, will be developed as a National Square. Since the Willard Hotel has recently closed and is now available for the proposed project, *its acquisition at the earliest possible date is of crucial importance.* [Emphasis supplied.]

On the same day, October 24, 1968, the Secretary amended the Order of Designation for the Pennsylvania Avenue National Historic Site to enhance the likelihood of acquiring the Willard by removing the limitation on the authority of the Interior Department to use appropriated funds on the National Square plan. The formal request from the Secretary spurred on GSA; further delays in consummating a trade raised the spectre that plaintiffs might erect an expensive new building on the site, which, when the time for condemnation and demolition to make way for the Square finally came, would greatly increase the Government's costs of acquisition.

During this interlude of trade negotiations with GSA, between November 1969 and March 1970, plaintiffs sold all the furniture, fixtures and other personal property in the hotel at public auction. Plaintiffs knew that their operation of the Willard as a hotel would not be feasible. They were investors, not hoteliers. To leave the building vacant, with its valuable fixtures, ran the foolish risk of vandalism, a matter of much concern to the owners because of the disturbances which plagued the city in 1968. Moreover, a large-scale investment in a structure slated for razing seemed unsound to them. Prior to gutting the inside of the structure, plaintiffs had sought to make profitable use of the site. The possibility of constructing an office building remained under consideration. Other business opportunities were explored. In 1968, plaintiffs attempted to lease the building to a hotel chain which would modernize and refurbish the premises. This deal collapsed when the plaintiffs were asked to guarantee that the property would not be condemned for a specific period of time. In the fall of 1969, the Inter-American Development Bank advised plaintiffs that it was interested in purchasing the Willard. The Director of the Bank informed plaintiffs that any such move would require GSA approval. Recognizing the conflict between the proposed purchase and the plan for a National Square, the GSA refused to permit the Bank to consider acquisition of the Willard.

On February 12, 1969, plaintiffs filed an application for a building permit to construct a new, income producing office building on the Willard site. The application was denied by the District of Columbia Department of Licenses and Inspections upon the recommendation of the District of Columbia Commission of Fine Arts, which

found that the owners' building plans were inconsistent with the development of the Pennsylvania Avenue National Square proposal. Thereafter, following intervention by the owners, the office of Corporation Counsel for the District of Columbia rendered its opinion that the permit should have been issued. His opinion stated that the plan adopted by the Temporary Commission for Pennsylvania Avenue was without a statutory basis, because the plan had not been approved by the Zoning Commission and therefore "should not be afforded any validity in regulating land use."

The requested statutory basis for the plan proposed by the Commission was not provided by the 91st Congress, which failed to take action on resolutions introduced in January 1969. Moreover, in an act passed on October 15, 1969, Congress eliminated funds for the continuation of the Commission. Plaintiffs did not proceed at that time with their efforts to obtain a permit for the demolition of the building, because the chairman of the Commission assured them that the Pennsylvania Avenue plan would be implemented very soon by the Government's acquisition of the Willard for demolition. The Commission's final report in 1969 retained the National Square plan, which had also been approved by the Commission of Fine Arts and the National Capitol Planning Commission. In 1969 and 1970, plaintiffs also met, on several occasions, with Daniel P. Moynihan, then a presidential assistant, who repeatedly assured plaintiffs that a trade for the Willard should be worked out. Mr. Moynihan stated that he recognized that the owners of the Willard were being shabbily treated by continued delays.

Over the next 2½ years, efforts to complete an exchange for the Willard persisted, and legislation was sought which would establish a fully empowered corporation to implement the plan. The efforts to negotiate a trade for the hotel terminated when, on October 27, 1972, Congress enacted the Pennsylvania Avenue Development Corporation Act of 1972, Pub.L. 92–578, 40 U.S.C. §§ 871, *et seq.* The Act, as its name con-

veys, established the Pennsylvania Avenue Development Corporation (PADC) to prepare and effectuate a development for the area specified in the statute. The Willard was within the delineated region. The Act provided for an elaborate procedure of hearings and reviews to transpire before any plan recommended became effective. The last step in the approval process of a plan involved a 60-day review by both Houses of Congress. In order to implement the improved plan, the PADC was given a broad range of powers. In 40 U.S.C. § 875(6), the PADC was authorized to:

> \* \* \* acquire lands, improvements, and properties within the development area by purchase, lease, donation or exchange; \* \* \* hold, maintain, use, or operate such properties; \* \* \* sell, lease, or otherwise dispose of such real and personal property and any interest therein as the Corporation deems necessary to carry out the development plan; or \* \* \* lease, repurchase, or otherwise acquire and hold any property which the Corporation has theretofore \* \* \* disposed of: *Provided,* That condemnation proceedings for the acquisition of real property (including interests therein), which may be necessary or appropriate in order to carry out the development plan, shall be conducted in accordance with the procedural provisions of chapter 13, subchapter IV, of title 16 of the District of Columbia Code.

However, before such powers could be exercised, further Congressional action was needed to authorize and appropriate funds for such purposes.

The 1972 act, 40 U.S.C. § 876, contained the following one-year moratorium provisions:

> (b) After October 27, 1972, no new construction (including substantial remodeling, conversion, rebuilding, enlargement, extension, or major structural improvement of existing buildings, but not including ordinary maintenance or remodeling or changes necessary to continue occupancy) shall be authorized or conducted within the development area except upon

prior certification by the Corporation that the construction is, or may reasonably be expected to be, consistent with the carrying out of the development plan for the area: *Provided*, That if the development plan for the area does not become effective under the provisions of section 5 within twelve months of the date of enactment of this Act, this subsection shall be of no further force and effect until such time as the development plan does become effective under that section.

Early PADC expectations concerning a plan continued to envision a National Square and the demolition of the Willard. However, on October 26, 1973, the one-year moratorium on new construction contained in the Act expired because no development plan had become effective. Plaintiffs again applied to the District of Columbia government for a routine permit to demolish the nonstructural elements of the Willard in order that architects could examine the steel girders to determine whether the structural frame was suitable for the construction of a modern office building. The District of Columbia improperly submitted plaintiffs' application to the Commission of Fine Arts, purportedly seeking "appropriate action in accordance with the [Shipstead-Luce] Act." § 5–410, D.C. Code (1973), 40 U.S.C. § 121 (1970). In late November 1973, the Commission of Fine Arts returned the application to the District of Columbia government with the admonishment that the permit should not issue since removal of the exterior architectural features of the historic building was not in the public interest. The District of Columbia then denied the application.

The sentiments of the Commission of Fine Arts were soon to be shared by PADC; this emphasis on preservation of the Willard marked a complete about-face from Government plans dating back to 1962. Thus, while the first proposed PADC plan dated March 18, 1974, recognized the financial impracticality of maintaining the Willard and anticipated its demolition, the PADC plan of October 1974 called for continued existence of the Willard and its reha-

bilitation. The October 1974 plan became effective on May 19, 1975, after all statutory steps had been taken and Congress had acquiesced.

On December 21, 1973, plaintiffs, having been thwarted in obtaining the desired permit, filed suit in the Superior Court of the District of Columbia, cf. *Charles B. Benenson, et al. v. Commissioner of the District of Columbia, et al.,* Civ. Action 10837–73. On June 11, 1974, the Superior Court granted plaintiffs' motion for summary judgment and ordered the Mayor-Commissioner and the District of Columbia "to issue to plaintiffs the permit, applied for on October 26, 1973, to demolish the nonstructural elements of the Willard Hotel."

On October 1, 1974, Congress enacted Pub.L. 93–427, 88 Stat. 1170 which reinstated the moratorium provision that had been included in the 1972 act, 40 U.S.C. § 872(b). The 1974 statute, like its predecessor, provided that no conversion, remodeling, or major structural improvement of any existing building within the area covered by the PADC development plan could be conducted except upon prior certification by the PADC. This second moratorium was to expire on June 30, 1975, unless the development plan for the area became effective by that date. As previously stated, the Pennsylvania Avenue Development Plan became effective on May 19, 1975, and therefore, the law requiring prior approval of changes in the existing buildings remained in effect thereafter.

On December 10, 1975, the District of Columbia Court of Appeals unanimously affirmed the decision of the Superior Court, holding that the Shipstead-Luce Act, *supra*, did not give the Commission of Fine Arts the authority to consider applications for permits such as that filed by plaintiffs. *Commissioner of the District of Columbia v. Benenson,* 329 A.2d 437 (D.C.App.1974). The court also observed that "to deny the requested permit would raise the spectre of a taking without due process of law." (329 A.2d at 442.) On December 31, 1974, PADC entered that suit for the first time and joined in a petition for rehearing sought by

the District of Columbia. The petition was denied February 20, 1975.

On December 16, 1974, shortly after the Court of Appeals had affirmed their right to the permit, plaintiffs were sued in the United States District Court for the District of Columbia by Don't Tear It Down, Inc. and Frank H. Rich. Also named as defendants were the Mayor-Commissioner and the Chief of the Permit Branch of the District of Columbia. The suit sought declaratory relief that the PADC Act (specifically the moratorium reinstated October 1, 1974), prohibited the District of Columbia from issuing the requested permit without prior approval of PADC. On December 27, 1974, PADC notified Mayor-Commissioner Walter Washington of its objections to the issuance of the permit, and on January 10, 1975, intervened as plaintiff in the action filed by Don't Tear It Down, Inc. On February 26, 1975, the District of Columbia notified the District Court that the PADC had requested that the permit not be issued, and therefore, that the Mayor and the Chief of the Permit Branch would decline to issue the permit until PADC certified that it be issued.

On August 26, 1975, the District Court enjoined plaintiffs from demolishing, converting, removing, or altering the exterior facade of the Willard without prior certification from PADC that such work was consistent with its development plan for the area. *Don't Tear It Down, Inc. v. Washington*, 399 F.Supp. 153 (D.C.D.C.1975). The basis of the decision was the reenactment of the moratorium provision on October 1, 1974, which became permanent by reason of the fact that the PADC plan became effective May 19, 1975. The court found that the permit sought by plaintiffs was within the coverage of the Act and ruled that the "only activities excluded from this broad definition of new construction are ordinary maintenance or remodeling or changes necessary to continue occupancy." (399 F.Supp. at 156).

The injunction continues in effect. On September 23, 1975, the PADC formally rejected the request which the plaintiffs had made on October 23, 1973 to demolish the facade of the building.

On September 11, 1975, plaintiffs appealed the decision of the District Court to the United States Court of Appeals for the District of Columbia Circuit. Action on the appeal has been stayed by that court's order of October 29, 1976, pending our resolution of this suit.

After its plan became effective in May 1975, PADC promptly requested appropriations by Congress to implement the development plan. The President's budget for the fiscal year 1977 requested appropriations of $11.4 million for public improvements and $25 million in treasury borrowings. In explaining the proposed use of the requested funds, the Chairman of the PADC stated that the $25 million would be used during the first year for the acquisition of property and that the Willard had a high priority in these plans. Although a bill to authorize full funding of the plan was passed by the Senate and favorably reported by the House Committee on Interior and Insular Affairs, the legislation failed of passage in the House. However, on August 14, 1976, Congress amended the Pennsylvania Avenue Development Corporation Act of 1972 by authorizing appropriations for the operating and administrative expenses of the PADC until the fiscal year ending September 30, 1978, Pub.L. 94–388, 90 Stat. 1188. Public Law 94–388 authorized appropriations of $38.8 million for the implementation of the development plan. The Act was a confirmation of the PADC's restrictions, which prevented plaintiffs from making any reasonable use of the hotel, and contained the following express declaration by Congress that the Willard should be acquired by the PADC:

* * * *Provided*, That appropriations made under the authority of this paragraph shall include sufficient funds to assure the development of square 225 as a demonstration area for the development plan, and shall assure the preservation of the structure now located on square 225 known as the Willard Hotel and its historic facade. * * *

However, no funds have actually been appropriated for the purchase or condemnation of the property and at the time this case was argued and submitted, there was no indication as to when or if Congress would provide the essential funds.

## II.

■ The beginning point for resolving the legal issue presented by the foregoing facts is Justice Holmes' classic formulation in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922):

> Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits. * * * One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts. The greatest weight is given to the judgment of the legislature but it always is open to interested parties to contend that the legislature has gone beyond its constitutional power. (at 413, 43 S.Ct. at 159.)

> \* \* \* \* \* \*

> The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. (at 415, 43 S.Ct. at 160.)

Subsequent decisions by the Supreme Court, by this court, and by other courts have reaffirmed the principle that the Government's interference with the owner's use of his property may be so substantial and burdensome that a constitutional taking is implied. *United States v. General Motors Corporation*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945); *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958); *Bydlon v.*

*United States*, 175 F.Supp. 891, 146 Ct.Cl. 764 (1959); *Eyherabide v. United States*, 345 F.2d 565, 170 Ct.Cl. 598 (1965); *Brown v. Tahoe Regional Planning Agency*, 385 F.Supp. 1128 (D.Nev.1973), and *Keystone Associates v. State of New York*, 82 Misc.2d 620, 371 N.Y.S.2d 814 (1975).

Beginning in 1972, when the act creating the PADC was passed and culminating on August 14, 1976, when Public Law 94–388 was enacted, the acts of the defendant have so impeded and restrained the plaintiffs as to deprive them of any reasonable use of their property. For many years, both the plaintiffs and the officials of the Government have recognized that it is not economically feasible to restore and operate the existing building as a hotel or other business property, but the defendant has barred the plaintiffs from demolishing the property and using the site for other purposes. The owners have also been enjoined from removing the facade of the building for the purpose of determining whether the structure of the building will permit a profitable use of the building for purposes other than the operation of a hotel.

The Willard has been under a cloud of condemnation at least from October 27, 1972, when the Pennsylvania Avenue Development Corporation Act of 1972 was passed, until the present time. The net effect of the acts of the Government is that plaintiffs cannot use their property for any income-producing purpose; they cannot sell it and thus far, the lack of Congressional appropriations has denied them compensation for it. Consequently, plaintiffs are forced to preserve the structure for the benefit of the Government, which bears no part of the financial responsibility. Since 1968, plaintiffs have been losing money on the property to the extent of $300,000 per year. There is essentially no dispute that at the present time and under existing circumstances, the property lacks a viable economic use and has in fact a negative market value.

The situation in which plaintiffs find themselves is substantially similar to that

described by this court in *Drakes Bay Land Co. v. United States*, 424 F.2d 574, 586, 191 Ct.Cl. 389, 411 (1970), in which we decried the harsh results which plagued an owner after Congress had specifically earmarked his property for acquisition by the Government:

> Thus plaintiff remains without a market for its land. The private sector is not interested, understandably, because of the well publicized threat of eventual condemnation of Seashore realty. The public sector, namely the National Park Service, is not interested because after having successfully thwarted plaintiff's subdivision plans, it realizes that plaintiff is a party who can be deferred interminably, and dealt with at pleasure. * * *

*See also Foster v. City of Detroit*, 254 F.Supp. 655 (E.D.Mich.1966), *aff'd* 405 F.2d 138 (6th Cir. 1968); *Halpert v. Udall*, concurring opinion, 231 F.Supp. 574 (S.D.Fla. 1964), *aff'd per curiam*, 379 U.S. 645, 85 S.Ct. 610, 13 L.Ed.2d 550 (1965); Van Alstyne, Taking or Damaging by Police Power: the Search for Inverse Condemnation Criteria, 44 So.Cal.L.Rev. 1 (1971).

■ On the basis of the facts outlined above and the authorities cited, we conclude that the acts of the defendant, when considered in their totality, have so restricted and interfered with plaintiffs' use of their property as to constitute a complete taking of plaintiffs' fee interest therein, and that the taking occurred not later than August 14, 1976, when Congress enacted the amendment to the Pennsylvania Avenue Development Corporation Act of 1972.

### III.

In its opposition to plaintiffs' motion, defendant has raised several defenses which we reject, because we find them contrary to the undisputed facts and unsupported by the authorities relied upon by the Government. We have also determined that the affidavit and accompanying material proffered by the defendant to defeat summary judgment for plaintiffs do not raise a substantial issue of fact which requires a trial.

### A.

■ Defendant first contends that there has actually been very little interference with the use of plaintiffs' property as a result of the restriction imposed by PADC's denial of plaintiffs' request to remove the facade of the building. Defendant asserts that there are no other restraints on the use of the structure; that plaintiffs have complete freedom to alter the interior of the building for uses other than a hotel, and that the PADC has not prohibited the sale or other use of the property. In support of this argument, defendant has directed us to a line of cases which hold that a mere drop in property value as a result of a Government regulation is not *per se* a taking, and the fact that a regulation deprives the owner of the most profitable use thereof is not sufficient to entitle the owner to just compensation. These cases include *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958) and *Maher v. City of New Orleans*, 516 F.2d 1051 (5th Cir. 1975) *cert. den.*, 426 U.S. 905, 96 S.Ct. 2225, 48 L.Ed.2d 830 (1976). We find these and similar decisions relied on by defendant to be inapposite. In *Goldblatt*, the Supreme Court upheld an ordinance, which prevented mining below the water table, on the ground that there was no evidence which "even remotely suggests that the prohibition of further mining will reduce the value of the lot in question." (369 U.S. at 594, 82 S.Ct. at 990.)

In *Central Eureka*, the court upheld a regulation which was issued for the purpose of conserving equipment and manpower for essential wartime uses. Although it recognized that a regulation can so diminish the value of property "as to constitute a taking," the court based its refusal to award plaintiff just compensation on the following:

> The reasons are plain. War, particularly in modern times, demands the strict regulation of nearly all resources. It makes demands which otherwise would

be insufferable. (357 U.S. at 168, 78 S.Ct. at 1104.)

In *Maher*, the Fifth Circuit denied plaintiff's claim that a taking had occurred on the ground that he had not shown that "sale of the property was impracticable, that commercial rental could not provide a reasonable rate of return, or that other potential use of the property was foreclosed." (516 F.2d at 1066.)

By contrast, the alleged potential uses of the Willard amount to no more than naked legal rights and for all practical purposes are completely unavailable to the owners. There can be no doubt in this case that there is no potentially profitable use of the Willard property that does not first proceed from the removal of the facade or the demolition of the entire structure. In its first Pennsylvania Avenue plan dated March 18, 1974, the PADC stated:

> Putting the Willard back into operation as a hotel would create a deficit of about $12 million. This assumes an estimated acquisition cost of $8 million for the Willard Hotel and the site adjoining it, along with an estimated rehabilitation cost of $15 million for the Hotel. Since the revenues generated by the Hotel and adjacent new construction could only support a total investment of $11 million it would be necessary for the Corporation to absorb the remaining $12 million of the cost of buying and fixing up the building. If the structure is converted to office use, the deficit would be about $11 million.

The National Trust for Historic Preservation commissioned a study entitled "The Willard Hotel Feasibility Study" which was dated October 1, 1974, and accompanied the plan PADC submitted to the Congress. It considered seven alternative uses of the Willard, leaving the facade intact. The first of these, assumed the use of the building as a hotel and showed that a capital expenditure of $19,875,000 would be required for renovation and that after this expenditure, the operation would result in a cash flow deficit of $505,580 per annum. Two office building alternatives showed project losses of $16,800,000 and $21,750,-

000. Two alternative proposals for use of the building as a condominium showed losses of $6 million and $14 million. An alternative which contemplated a mixed use of the property showed a project loss of $9,250,000.

Relying primarily on *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954) and *Maher v. City of New Orleans*, *supra*, the defendant also argues that the restriction which prohibits plaintiffs from removing the facade of the Willard without the approval of the PADC as required by the Act of October 27, 1972, 40 U.S.C. § 876, is a valid exercise of the police power and does not give rise to a claim of taking and the recovery of just compensation. We do not question the now well recognized rule that an ordinance or regulation enacted for the purpose of preserving and maintaining historic buildings and sites is a valid exercise of the police power. It is equally incontestable that when a regulation becomes as extensive, restrictive and burdensome as we have found defendant's restrictions to be in this case, it constitutes a taking of the citizen's property for which the Fifth Amendment mandates the payment of just compensation. *Berman v. Parker; Bydlon v. United States* and *Brown v. Tahoe Regional Planning Agency*, *supra*. Unlike the facts in the cases cited by the defendant, plaintiffs have no beneficial or reasonable use of their property left to them. They are, in fact, forced by the PADC denial to maintain the Willard for the benefit of the populace at a cost of hundreds of thousands of dollars a year, with a complete loss of profits and with no certain and foreseeable relief.

### B.

Defendant's second defense is that the lack of any feasible economic use of the Willard Hotel is due not to the regulation issued by the defendant, but to plaintiffs' gutting of the building, plus years of deferred maintenance. Relying on an affidavit sworn to some 6 months after this suit was filed, defendant claims it is prepared to show at trial that if the plaintiffs had not

gutted the hotel and had invested about $1,400,000 in maintenance, the property would now have a market value of about $20 million. Plaintiffs have aptly characterized this contention as one "made with the benefit of 20:20 hindsight * * * which strikes a false note," and totally ignores the situation that existed when the hotel was gutted. Nevertheless, since the case is before us on plaintiffs' motion for summary judgment, we accept the affidavit and accompanying material for what they purport it to be—the opinion of an expert prepared for this litigation and containing statements to which he would testify if a trial were held. At the same time, we hold, as a matter of law, that the affidavit is immaterial and raises no triable issue, because its relevancy rests entirely on erroneous assumptions made by the defendant. These assumptions are that the plaintiffs were guilty of negligence in failing to keep the property in condition as an operating hotel and in disposing of the personal property; that plaintiffs exercised poor business judgment; that their treatment of the property rather than defendant's restrictive acts caused the hardships and losses plaintiffs are now suffering, and that such treatment of the property is a legal bar to plaintiffs' right to recover just compensation.

We find that these assumptions are in conflict with the undisputed evidence of record before us as to the events that occurred and the actions of the parties in the years that are pertinent to this action. We also find that defendant's contention respecting the principles of law that apply to the facts is in error.

When the Willard Hotel was closed in July 1968 because of the serious financial difficulties of the lessee, it was the opinion of the manager, who had been in charge of the hotel from October 1966 to July 1968, that it would have cost a minimum of $4 million to $5 million to place the hotel in a competitive operating condition. It was also his opinion, expressed at that time, that the cloud of condemnation and the ultimate planned use of the property by the Government were significant deterrents to further investment in the property. After plaintiffs, who were not hotel operators, were unsuccessful in leasing the hotel to a concern which would modernize and refurbish it, Mr. Benenson met with Nathaniel A. Owings, the Chairman of the Commission, during the summer of 1968 and was assured that the Pennsylvania Avenue Plan for the demolition of the building to make way for the National Square would be implemented very soon. Mr. Owings was upset when he heard that plaintiffs were exploring the possibility of demolishing the hotel and erecting a new building on the site. The Chairman urged Mr. Benenson to forget about his building plans since the Commission's plan for the National Square was a certainty.

At the request of the Government officials, plaintiffs agreed to cooperate with the Government in attempting to effect an exchange of the Willard for Government surplus property. Joe Moody, Deputy Administrator of GSA conducted most of these negotiations with Mr. Benenson. Mr. Moody sent Mr. Benenson a list of surplus properties for plaintiffs to consider in exchange for the Willard Hotel, and during the next 5 years, plaintiffs spent thousands of dollars in inspecting the properties which were located in many places in this country. The negotiations ended in 1972, just prior to the passage of the PADC Act.

On February 6, 1969, just 6 days before plaintiffs filed an application with the District of Columbia for a permit to construct a new office building on the site of the Willard, Chairman Owings of the Commission telegraphed Benenson as follows:

> I urge you not to seek legal action against the District as you continue your negotiation with GSA. We will do everything in our power to expedite the transaction. I urgently request a favorable reply.

It was not until August 15, 1969, that plaintiffs requested the permission of the Equitable Life Assurance Society of the United States, which held a mortgage on the Willard Hotel, to sell all removable furniture and fixtures. The furniture, fix-

tures and equipment were sold to the public between the months of November 1969 and March 1970. Thus it is undisputed by the record before us that before the furniture and fixtures were sold, plaintiffs had been unable to find a lessee who would take over and operate the hotel, and that they were frequently urged by Government officials to do nothing with the hotel that would interfere with the then settled plan of the Government to acquire and demolish the hotel in order to make way for the Government structures to be erected in the new National Square. In view of all these circumstances, it can hardly be said that plaintiffs exercised poor business judgment or that they acted negligently in failing to make a large capital investment to keep the hotel operating. It was certainly in the Government's interest that plaintiffs not increase their capital investment in the Willard—otherwise the Government's cost of the proposed acquisition would have been increased.

Plaintiffs' fear that the valuable property and memorabilia in the building would be the subject of vandalism was a reasonable one in view of the civil disturbances which occurred in Washington, D.C. in 1968. When the public auction was held, no one could have predicted that the Government, some 6 years later, would completely reverse its plans and require the preservation rather than the demolition of the buildings in square 225.

In advancing its argument, defendant relies heavily on the example provided by the Washington Hotel which is also located in square 225 and was another of the buildings which were to be demolished under the Commission's plan for the National Square. In 1968, the Washington Hotel began a $1 million renovation and has successfully operated as a hotel from that time until the present. Apparently, it is the position of the defendant that plaintiffs should be penalized because they lacked the prophetic wisdom possessed by the owners of the Washington Hotel and failed to foresee that 6 years later, the Government would make a turn of 180 degrees in its plans for the

buildings in square 225. Aside from the fact that the Washington Hotel is a family-owned business and is operated by persons with extensive experience as hoteliers, the action taken by the Washington Hotel in 1968 acts more to confirm than to detract from the business judgment of plaintiffs. Contrary to defendant's position in this action, the Washington Hotel's large investment in the extensive renovation in 1968 was regarded by officers of the Commission as an act of folly. Their view of the matter at that time was correctly reflected in an article published in the AIA Journal in December 1968. The article read in part—

But in some quarters the Willard's swan song sounds like a promising overture. Viewing its demise as an important step toward the renewal of the nation's most historic avenue is Nathaniel A. Owings, FAIA, chairman of the President's Temporary Commission on Pennsylvania Avenue. For if the Willard is razed, the rest of the block between Pennsylvania Avenue, 14th, F and 15th Streets will likely follow suit and the commission's plan for a National Square become reality.

\*       \*       \*       \*       \*       \*

At present, the General Services Administration is trying to locate a suitable piece of government surplus land to exchange with the Willard's owners. Such an arrangement could be a catalyst and bring the rest of the $8-million block over on government hands.

\*       \*       \*       \*       \*       \*

Eliminated would be the Washington Hotel, now stubbornly undergoing a $1-million renovation, the Occidental restaurant "where statesmen dine" and two parking garages.

■ The legal conclusion which defendant would draw from its mistaken version of the facts is that since plaintiffs disposed of the furniture and fixtures and failed to invest a substantial sum in the maintenance of the Willard, plaintiffs are legally barred from claiming that their property was taken by the restrictive actions of the defendant which were authorized in a law that

was not passed until several years after the public auction was held. Defendant has advanced no persuasive authority for this novel proposition. If that were the law, the Government could rely on an owner's treatment of his property many years prior to the issuance of a regulation or the passage of a statute as a defense to a claim of taking. Certainly, the case of *C. F. Lytle Co. v. Clark*, 491 F.2d 834 (10th Cir. 1974), does not support defendant's argument. In that case a property owner obtained a building permit for the construction of 123 resort lodge condominium units. Two weeks thereafter, a zoning change was adopted which deleted "lodges" from permitted uses. Nevertheless, the owner commenced construction of the lodge units and recorded a Condominium Map and Condominium Declaration which set aside the entire tract for the condominium resort lodges. After some 24 units had been completed, the owner had financial problems and construction ceased. Five years later, the owner filed an application for a building permit, stating that he wished to finish the work under the original permit. The application was denied, because the original building permit was no longer valid and the use of a permit to construct lodges was nonconforming. The result of the owner's filing and recording the Condominium Declaration was to preclude the use of the undeveloped land for any other purpose, notwithstanding the fact that there were other allowable uses under the zoning regulations then in effect. The court held that it was unnecessary for the owner to record the Condominium Declaration on all the units and for all the land before he had completed any of the construction and that as a result of his own voluntary acts, he had created the hardship confronting him. The court then concluded that there was no taking, because: "A landowner cannot create his own hardship and then require that zoning regulations be changed to meet that hardship." (491 F.2d at 838.)

In this case, plaintiffs' closing of the hotel and the sale of the furniture and fixtures were not prohibited by any law or regulation then in effect. Plaintiffs do not claim that their property was taken by the Government prior to 1972, nor that they are entitled to recover on the basis that the Willard, at the time of the taking, was a profitably operating hotel having a market value of $20 million as estimated by defendant's expert. Unlike the owners in *Lytle*, plaintiffs did not act in defiance of a regulation or statute. On the contrary, the decisions which plaintiffs made and their treatment of the property in 1968 and 1969 were in no way contrary to the plans and policies which the Government had formulated more than 4 years before the furniture and fixtures were sold and which were then in effect.

We conclude, therefore, that defendant's argument regarding the principles of law that are applicable here is without merit.

IV.

For the reasons stated above, plaintiffs' motion for summary judgment on all issues relating to defendant's liability, with the exception of the date of taking, is granted and the case is remanded to the Trial Division to determine the amount plaintiffs are entitled to recover as just compensation. At oral argument, defendant's counsel stated that if the court held that plaintiffs' property was taken, the Government would be willing to concede that the taking occurred on October 27, 1972, the date the PADC Act became effective, and plaintiffs' counsel stated that he would also agree that the property was taken at that time. Accordingly, on remand the trial judge is authorized and directed to determine, on the basis of a stipulation by the parties or evidence adduced by them, when plaintiffs' property was taken, provided that such date shall not be prior to October 27, 1972 nor later than August 14, 1976.

DAVIS, Judge, concurring:

I join the court's opinion but wish to make it explicit that, for me, the possibility of a taking before August 14, 1976, depends on the correctness of the position announced by Chief Judge Jones in *Don't*

*Tear It Down, Inc. v. Washington,* 3⌒⌒ F.Supp. 153 (D.D.C.1975), now on appeal to the U.S. Court of Appeals for the D.C. Circuit, that under the congressional legislation the owners could not demolish the Willard or change the facade during the moratoria (without permission of the Pennsylvania Avenue Development Corporation). I accept and agree with Judge Jones' ruling. But if it should finally and authoritatively turn out that that position is incorrect, either because such alterations were permissible under the statute even during the moratoria (*see* 399 F.Supp. at 155–56) or because the owners obtained—during the period from October 26, 1973, to October 1, 1974, when there was no moratorium—a vested and continuing right to demolish (*see* 399 F.Supp. at 156–57), then I believe that the taking date would have to be August 14, 1976. I do not at all expect that there will be a final and authoritative decision in conflict with the position of *Don't Tear It Down, Inc., supra,*[1] but I place this caveat on the record because it is essential to my thinking with respect to a pre-August 1976 date-of-taking that the owners could not alter the facade or other non-structural elements of the Willard during the moratoria contemplated by Congress in the Pennsylvania Avenue Development Corporation Act of October 27, 1972.

1. The Court of Appeals, after counsel had appeared for oral argument, stayed action on the appeal in that case pending resolution of the present action.