James J. JENTGEN, Trustee

v.

The UNITED STATES.

No. 415–77.

United States Court of Claims.

Aug. 19, 1981.

Thomas C. Henry, Washington, D. C., for plaintiff; Carl L. Shipley, Washington, D. C., attorney of record. Shipley, Smoak & Akerman, Washington, D. C., of counsel.

Fred R. Disheroon, Washington, D. C., with whom was Asst. Atty. Gen., Carol E. Dinkins, Washington, D. C., for defendant; Elizabeth Stein and Hubert M. Crean, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, SKELTON, Senior Judge, and KUNZIG, Judge.

OPINION

KUNZIG, Judge:

In this case, plaintiff contends that he has suffered an uncompensated taking as

the consequence of federal regulation affecting his development of a planned residential community near the Everglades.[1] The statutes in question—§ 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403, and § 404 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1344—and implementing regulations thereunder, prohibit, *inter alia*, obstructions, dredging and filling in navigable waters without the authorization of the Army Corps of Engineers. The latter, stressing environmental factors, has thus far refused to grant plaintiff the permits for which he has applied. We hold that while plaintiff may indeed have sustained some economic loss, the loss is not such as to constitute a taking under the circumstances herein.

I

Plaintiff, Jentgen, in 1971 purchased for $150,000 a 101.8 acre tract located within the city limits of Everglades City, Florida, in an area neighboring the Everglades National Park.[2] Jentgen planned to develop there a water-oriented residential community. The property, completely undeveloped, lay astride the mean high water mark and contained large areas of dense mangrove vegetation, including wetlands. The project would necessitate considerable earth-moving, dredging and filling, and the erection of a dock and marina.

As of 1971, the purchase date, these proposed activities were subject to § 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403 (1976) (Rivers and Harbors Act), which requires a permit from the Army Corps of Engineers to the extent that "any obstruction" is created in the "navigable waters of the United States." The Corps defines "navigable waters of the United States" to encompass tidal waters shoreward to the mean high water mark and/or waters suitable for use in commer-

cial navigation. *See* 33 C.F.R. § 322.2(a) (1980).

In 1972, Congress enacted § 404 of the Federal Water Pollution Control Act Amendments, 33 U.S.C. § 1344 (1976) (FWPCA), which prohibits the "discharge of dredged or fill material . . . into navigable waters" without a permit from the Army Corps of Engineers. The most significant feature of the new statute for the case at bar was the extension of Corps jurisdiction from "navigable waters of the United States" to "navigable waters." It is now well settled that Congress, in adopting the latter term, "asserted federal jurisdiction over the nation's waters to the maximum extent permissible under the Commerce Clause." *Natural Resources Defense Council, Inc. v. Callaway*, 392 F.Supp. 685, 686 (D.D.C.1975). Notably, both the Corps and the courts have interpreted "navigable waters" to include "adjacent wetlands." *See* 33 C.F.R. § 323.2 (1980); *United States v. Holland*, 373 F.Supp. 665, 673–674 (M.D. Fla.1974).

The implication for Jentgen was that, as of 1972, a greater proportion of his property fell within the regulatory jurisdiction of the Corps than had previously been the case and the areas subject to the need for a permit had been widened.

Until 1968, the Corps' sole criterion in granting permits within its jurisdiction was the likely adverse impact upon commercial navigation. However, on December 18, 1968, in response to a growing national concern for environmental values and related federal legislation, the Corps stiffened its requirements, adding the following relevant considerations: fish and wildlife; conservation; pollution; aesthetics; ecology; and the general public interest.

On April 4, 1974, the Corps published further revised regulations so as to:

1) incorporate new permit programs under section 404 of the FWPCA;

---

1. The court rejects the trial judge's recommended conclusion of law. While the trial judge also made findings of fact, all the findings necessary to the rendering of this decision are contained herein.

2. For a more extensive discussion of the ideas reflected herein, *see Deltona v. United States*, Ct.Cl., 657 F.2d 1184, (1981), issued the same date as this opinion.

2) incorporate the requirements of new federal legislation by adding to the factors to be weighed in the so-called "public interest review," including: economics; historic values; flood damage prevention; land-use classification; recreation; water supply and water quality;

3) inaugurate a full-fledged wetlands policy to protect wetlands subject to the Corps' jurisdiction from unnecessary destruction.

See 42 Fed.Reg. 37122–37164 (1977); 33 C.F.R. §§ 320.1–329.16 (1980). These stiffening requirements are the main source of the difficulties which have brought Jentgen before this court.

In 1973, plaintiff applied for a permit under § 10 of the Rivers and Harbors Act and in 1975 applied for the requisite permit under § 404 of the FWPCA. The applications related to approximately 80 acres of the Jentgen tract; the remaining 20 acres are uplands and can be developed without dredging and filling and, consequently, without the need for Corps authorization. Of the 80 acres covered by the applications, 60 were proposed for development and 20 were to be preserved in the natural state. On July 5, 1977, Jentgen was informed that his applications had been denied as "not in the public interest." The Corps especially stressed the "direct adverse physical impact" upon the mangrove wetlands located on Jentgen's property. Of crucial importance, however, Jentgen was offered modified permits which would have allowed for development of over 20 of the 80 acres covered by the applications, but the permits were declined. At no time has Jentgen sought judicial review of the permit denials. Instead, Jentgen filed suit in this court on August 9, 1977, seeking "just compensation" under the Fifth Amendment for the alleged taking of his property as the consequence of the Government's refusal to allow him to go forward with his original plans. He seeks approximately $6,000,000. Under the specific facts of this case, and the tests enunciated by the courts, we hold that there has been no taking in this case.

II

It is well established as a matter of law that government regulation can effect a Fifth Amendment taking. See, e. g., Penn Central Transp. Co. v. New York City, 438 U.S. 104, 123, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (no taking found on the specific facts of that case); Benenson v. United States, 212 Ct.Cl. 375, 388, 390, 548 F.2d 939, 947, 948 (1977) (taking found). The rationale, as stated by Justice Brennan, is that "[p]olice power regulations such as zoning ordinances and other land-use restrictions can destroy the use and enjoyment of property in order to promote the public good just as effectively as formal condemnation or physical invasion of property." San Diego Gas & Electric Co. v. San Diego, 450 U.S. 621, 652, 101 S.Ct. 1287, 1304, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting).[3] While, "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law," Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922), the principle generally applied is that "if regulation goes too far it will be recognized as a taking," id. at 415, 43 S.Ct. at 160; see San Diego Gas, supra, 450 U.S. at 649, 101 S.Ct. at 1302.

"The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest." Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). It is frequently stated that the question whether a particular restriction effects a taking depends largely upon the particular circumstances of the case. See, e. g., Penn Central Transp. Co., supra, 438 U.S. at 124, 98 S.Ct. at 2659. Generally speaking, the Just Compensation Clause preserves governmental power to

---

**3.** Justices Stewart, Marshall, and Powell joined Justice Brennan's dissent; Justice Rehnquist, writing separately, expressed general agreement with Justice Brennan's discussion of taking law. The opinion of the Court did not reach the issue addressed by Justice Brennan.

regulate subject to the dictates of "justice and fairness." *Andrus v. Allard*, 444 U.S. 51, 61, 65, 100 S.Ct. 318, 324, 326, 62 L.Ed.2d 210 (1979).

While "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations," *Penn Central Transp. Co., supra*, the decisions of the Supreme Court "uniformly reject the proposition that diminution in property value, standing alone, can establish a 'taking.'" *Id.* at 131, 98 S.Ct. at 2662, *citing, Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (75% diminution in value caused by zoning law); *Hadachek v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (87.5% diminution in value). Similarly, the Court has branded as fallacious the "contention that a 'taking' must be found to have occurred whenever the land-use restriction may be characterized as imposing a 'servitude' on the claimant's parcel." *Penn Central Transp. Co., supra*, 438 U.S. at 130 n.27, 98 S.Ct. at 2662 n.27. Instead, "the 'taking' issue in these contexts is resolved by focusing on the uses the regulations permit." *Id.* at 131, 98 S.Ct. at 2662. In one of its most recent pronouncements, the Court crystallized its thinking as follows: "The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests ... or denies a[n] owner economically viable use of his land ...." *Agins, supra*, 447 U.S. at 260, 100 S.Ct. at 2141, *accord, Hodel v. Virginia Surface Mining and Reclamation Ass'n*, —— U.S. ——, ——, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981); *Penn Central Transp. Co., supra*, 438 U.S. at 138, 98 S.Ct. at 2666; *Benenson v. United States*, 212 Ct.Cl. 375, 388–389, 548 F.2d 939, 947–948 (1977).

In applying the foregoing considerations, it is important to bear in mind the Supreme Court's admonition:

"Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel *as a whole* ....

*Penn Central Transp. Co., supra*, 438 U.S. at 130–131, 98 S.Ct. at 2662–2663 (emphasis supplied).

### III

■ Plaintiff initially contends that, as the consequence of *post hoc* government regulation during the early 1970's, he has been deprived of the economically viable use of his property and has therefore suffered a taking. The facts, however, thoroughly refute this contention. They show that the Corps did offer plaintiff the necessary permits to develop over 20 acres of the 80 acres covered by his applications, but that plaintiff refused. Overall, the tract contains approximately 20 additional acres of developable uplands which can be developed without first obtaining Corps permits. The record shows that the market value of the property, post-denial, is still between $80,000 and $150,000: the latter figure being the amount plaintiff paid for the property in 1971. These factors are flatly inconsistent with the proposition that plaintiff's property has been rendered valueless as the consequence of government regulation. In our view, the facts of this case are exceedingly weak, far weaker than those presented to the court in the comparable *Deltona* case, also decided this date, where another plaintiff failed in its taking claim. *See supra* at 1211 n.2.

■ Plaintiff alternatively contends that he has suffered a taking solely by virtue of the fact that he has been deprived of the highest and best economic use for his property—if not the entire use. This argument is merely another way of saying that there has been some diminution in the value of the property, rather than the complete destruction of all economically viable uses. The Supreme Court, however, has clearly held that mere diminution in value, standing alone, cannot establish a taking. *See Penn Central Transp. Co., supra*, 438 U.S. at

131, 98 S.Ct. at 2662–2663. Despite the changed phraseology, plaintiff's alternative argument fails as a matter of law.

By and large, we do not believe that "justice and fairness" require us to find a taking in this case. Reduced to its essentials, this case merely presents an instance of some diminution in value, or frustration of reasonable investment-backed expectations, stemming from changes in applicable statutes and regulations—an insufficient basis, under *Penn Central*, to establish a taking. We note that in a number of recent cases the Supreme Court has refused to find takings under circumstances arguably far more compelling than those presented by the case at bar. *See, e. g., Agins, supra; Penn Central Transp. Co., supra.*[4]

We feel that these considerations are dispositive of plaintiff's claim and hold that there has been no taking.[5]

### CONCLUSION OF LAW

The court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.

---

4. Because of our ultimate disposition of this cause, it is unnecessary to consider the impact of the federal navigational servitude upon the issues herein. *See generally Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

5. All other arguments raised by plaintiff, although not directly addressed by this opinion, have been considered and found to be without merit.