**Robert CIAMPITTI, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 440–87L.**

United States Claims Court.

Jan. 17, 1991.

---

Alfred A. Porro, Jr., Lyndhurst, N.J., for plaintiffs.

Dorothy R. Burakreis, Washington, D.C., for defendant. Barry Gale, U.S. Army Corps of Engineers, of counsel.

## OPINION

BRUGGINK, Judge.

This action, brought pursuant to the Fifth Amendment of the United States Constitution, is before the court after trial solely on the issue of liability. Plaintiffs claim that the denial by the United States Army Corps of Engineers of a permit to fill wetlands on their property constituted a taking without compensation. For the reasons set out below, the court concludes that the plaintiffs are not entitled to recover.

## FACTUAL BACKGROUND

Plaintiffs are the actual or nominal[1] owners of real property in Cape May County, New Jersey. The only relevant actor for purposes of this discussion was at all times Robert Ciampitti. The property at issue is located in Lower Township in an area known as Diamond Beach. Lower Township straddles a barrier island on the south New Jersey coast. It includes the beach, upland and marsh area of a portion of the island between Cape May City on the south and Wildwood Crest on the north. The western extremity of Diamond Beach adjoins an area of marsh and open water known as Jarvis Sound which separates the barrier island from the mainland.

Diamond Beach has been subdivided into lots since at least 1929 and has been reflected on tax maps since that time.[2] The tax maps reflect that the original expectation was that the subdivision would be bounded or bisected by six avenues or boulevards running in roughly a north-south orientation and in an east-west orientation by eight others. In fact, not all the originally-planned roadways have been laid.

---

1. Robert and Donna Ciampitti, husband and wife, are the only non-fictional, individual plaintiffs. Bruce Nicholas and Nicholas Pignotti are fictional names used by plaintiff Robert Ciampitti to hold title to certain parcels at issue. South Crest Realty, Inc., another plaintiff is a corporation wholly owned by Robert Ciampitti. Defendant does not contest that the Ciampittis are the real parties in interest, that all relevant owners are joined as plaintiffs, and that plaintiffs have title to the land at issue.

2. In a letter opinion, the Superior Court of New Jersey determined that, despite the lack of formal approval of a plot plan for Diamond Beach (*sub nom* Wildwood Gables), the subdivision does in fact have legal status. *Diamond Beach Joint Venture Association v. Township of Lower,* No. L.–46263–78 (Sup.Ct.N.J., letter opinion, March 6, 1980).

During relevant periods, lots west of Pacific Avenue were primarily zoned R–4, which permits single-family housing or duplexes, with some exceptions. Land to the east of Pacific Avenue was generally zoned R–6, which permits denser housing.

Robert Ciampitti has been familiar with Diamond Beach since the mid 1950's when his parents purchased a beach bungalow in adjacent Wildwood Crest. Ciampitti is currently 42 years of age. He has been in the real estate development business since the early 1970's and holds a degree in architecture from Temple University.

In late 1979 or early 1980, Ciampitti purchased a lot in Wildwood Crest and built a house there. The lot was purchased at auction from the city of Wildwood Crest. Ciampitti knew at the time that a few lots in Wildwood Crest were subject to a *lis pendens* filed by the state of New Jersey. The state lien was filed in order to reflect designation of the lots by the state as wetlands protected from development.

In order to build a swimming pool, Ciampitti needed to add to his own lot. This required purchase of the adjoining lot, which was not in Wildwood, but in Diamond Beach. Thus commenced a plan by which Ciampitti and an acquaintance, Harry Kane, proceeded to buy 42 unimproved lots in Diamond Beach within blocks 696, 701 and 706. Kane and Ciampitti purchased none of the contiguous lots which were within state-designated wetlands although in several cases Kane and Ciampitti purchased up to the boundary of the wetlands designation. There is no question that Ciampitti was aware at the time of the extent of state wetlands regulation in the area, and the court finds that the reason Ciampitti and Kane did not buy the adjacent lots is because they wanted to avoid lands designated by the state as wetlands.

These 42 lots were purchased for a stated consideration of $32,000 from Diamond Beach Venture Associates ("DBVA"). DBVA is a partnership that was formed in the 1950's by William Ciampitti, Robert's father, and five other individuals. Apparently, DBVA owned most or all of Diamond Beach at one time. This purchase began a series of seven purchases which are of note to this lawsuit. Some of these purchases involved multiple sellers and multiple buyers, but those complications are irrelevant to the suit. This first purchase within the Diamond Beach area by Ciampitti will be referred to hereafter as "Purchase 1."

The land purchased by Kane and Ciampitti had no installed streets or utilities. Ciampitti testified that it was below grade, that is, that it had to be filled in order to lay roads and prepare building lots. Kane and Ciampitti anticipated that the lots could be improved without difficulty and, because of a good real estate climate in the Wildwood area, could be resold at a profit. The climate for sales was good in Diamond Beach because other beach areas to the north were subject to a temporary but continuing moratorium on sewage hookups and because Wildwood Crest was running out of vacant lots. Ciampitti and Kane marketed their newly acquired lots as unimproved lots but agreed with purchasers to use their best efforts to obtain necessary permits from the city, county, and state in order to tie into existing sewage lines, lay roads and make other improvements necessary to make the lots buildable. Costs of those improvements were then to be passed along to the purchasers.

The plan to market Purchase 1 was a large success. Ciampitti and Kane quickly resold the lots at a substantially higher price, $303,700. Over the next two years Ciampitti and Kane were successful in getting the necessary state and local permits to improve the lots.

Shortly after this initial success, Ciampitti decided to buy from DBVA approximately 83 additional lots. These were within blocks 712, 717, and 722. The price was $150,000. This will be referred to as "Purchase 2." With the exception of a fraction of one lot, Purchase 2 is entirely outside state-designated wetlands. The sale was made to Ciampitti and his wife. Ciampitti made no more purchases with Kane. Although Purchase 2 was one block closer to the ocean, it was still in the western half of the subdivision. Most of the lots were zoned R–4. Ciampitti's interest in the

western half of Diamond Beach was prompted by lower land prices in that area. That part of the subdivision is generally less expensive because it is further from the beach and is zoned for less-dense housing.

During this period Ciampitti began doing business with Bruce Conklin. Conklin was interested in developing townhouses in Diamond Beach but only wanted to deal with improved lots. Accordingly, he and Ciampitti began a series of transactions in which Conklin agreed to buy improved lots from Ciampitti. Ciampitti got the necessary permits to develop most of the lots within blocks 712, 717, and 722, and eventually, Conklin purchased most of this land and has built on it.

Over the next two years, Ciampitti purchased 21 more lots in a series of four purchases from DBVA or its wholly-controlled entities. The total stated consideration for these purchases was $31,000. Most of these lots were within state-designated wetlands. These will be referred to as Purchases 3, 4, 5, and 6.

The final and most significant purchase by Ciampitti, insofar as this suit is concerned, occurred on September 15, 1983. The sale was, once again, by DBVA. The purchase price was about $3.3 million. Approximately 45 total acres were involved, about 14 of which were within state-designated wetlands. DBVA took back a mortgage of approximately $2.8 million. The total purchase, referred to hereafter as Purchase 7, involved all or part of 23 blocks within Diamond Beach. Ciampitti testified that purchase negotiations had commenced about six months earlier. Although he was not certain, Ciampitti's recollection is that a written sales contract was executed. No one has been able to locate it. It is clear that the sale was not conditioned on whether the lots legally could be developed.

Although Ciampitti was more interested in the western part of Diamond Beach, more than half of the lots in Purchase 7 are east of Pacific Avenue. Virtually all of the western lots are wholly or partially within state-designated wetlands. Approximately

four additional acres were also subsequently treated as wetlands subject to federal regulation by the Corps. The total of these 18 acres form the subject of the present claim for a taking.

Ciampitti explained to the court his reasons for deviating from his initial intentions and for his willingness to purchase in areas that he knew were designated as wetlands. Three factors figured into his thinking. The first reason was that DBVA wanted to sell all its holdings out at one time. Ciampitti thus had to buy the eastern lots in order to get the western ones. This did not concern Ciampitti, however, because of the second and third factors.

Ciampitti had been doing business with a commercial entity known as Siana and DiDonato ("DiDonato"). At the time of the negotiations and ultimate sale, Ciampitti had a commitment from DiDonato to purchase four of the ocean-side blocks that Ciampitti was going to buy from DBVA. The price agreed upon, and ultimately paid, was $3 million. In addition, DiDonato took an option on two other blocks. That option was later exercised and DiDonato paid a total of $1.6 million more. In short, Ciampitti was assured of recovering virtually the entire purchase price within the period of the mortgage payout, and in fact, recovered far more. He viewed the rest of the lots, including those on the western end of Diamond Beach, as, for all practical purposes, requiring no investment. This is a factor that was apparently not known to the partners in DBVA. Ciampitti counted on that information remaining secret, and judging by consummation of the necessary elements to his plan, he was correct.

The final factor in Ciampitti's thinking concerns the status of many of the western lots as designated state wetlands. Ciampitti was fully aware of the extent of state wetlands jurisdiction when he acquired all of the lots subject to his federal taking claim, and in fact regulated wetlands within New Jersey counties are shown on maps filed in the official records of the relevant counties. Two things minimized Ciampitti's concern about whether he would be able to develop the lots, despite their wet-

lands designation. The first involves their location and topography. Most of these lots are bracketed (on tax maps, if not on the ground) by Railroad Avenue on the west and Park Avenue on the east. If one follows these parallel lines north into Wildwood Crest, it is obvious that lands between those streets have been developed. A few of those lots were within state-designated wetlands. In addition, according to Ciampitti, the appearance of his newly purchased lots was similar to lots within Wildwood and Diamond Beach upon which the state and local authorities had allowed construction. (In fact, those other lots were not designated as state wetlands.) Also, although the lots were apparently marshy in places, there was an abandoned, elevated, railroad right of way to the west, between plaintiffs' property and the open waters of Jarvis Sound. There had been development on the right of way to the north, in Wildwood Crest. In addition, a portion of the southwest corner of the area had been used as a dump for building materials. In short, the area was not pristine.

The second reason supplied by Ciampitti as to why he was not concerned about the wetlands designation was that, in connection with a title search run for him in 1983 for the Purchase 4, 5, and 6 properties, he was shown a document within the Diamond Beach chain of title which appeared to be a very broad riparian grant by the state to earlier owners of the property. This grant, executed in 1907, purports to give the grantee the right, among other things, to dredge and fill in riparian lands. Ciampitti assumed this grant would trump the state's wetlands designation. He testified at trial, however, that he was not aware of any particular instance in which a riparian grant had been the basis for permitting fill and construction.

As subsequent events demonstrated, Ciampitti's assumption that he would have no problems getting permission from the state to fill and improve the lots was gravely in error. Nor had he calculated on trouble from a different source, the United States Army Corps of Engineers ("the Corps").

Pursuant to the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403 (1988), and the Clean Water Act of 1972 ("CWA"), codified, *as amended*, at 33 U.S.C. §§ 1251–1376, the Corps is given jurisdiction to regulate, among other activities, fill of navigable waters of the United States. Plaintiffs do not dispute that the Corps had authority under these statutes to assert authority to regulate the filling of the lands at issue. In any event, the defendant established through testimony that the lots treated by the Corps as federal wetlands in Diamond Beach were in fact wetlands. Pursuant to section 404 of the CWA, a mechanism was created to obtain permission to fill federal wetlands. 33 U.S.C. § 1344. In the absence of such a permit, fill is precluded.

Throughout this period Ciampitti used the engineering firm of George E. Speitel & Assoc. ("Speitel"). As early as 1980, Ciampitti was notified by Gary Franklin, of Speitel, that there was possible state and federal jurisdiction over wetlands in Diamond Beach. In addition, Ciampitti testified that in the Spring of 1981, Franklin summoned a Corps representative, John Olson, to the Purchase 1 site. Shortly thereafter, Speitel was notified that it was unlikely that a federal permit to fill the area would be granted. Ciampitti concedes that he was told by Speitel that portions of the west end of Diamond Beach might be subject to federal wetlands regulations, and that if they were, a permit would have to be obtained from the Corps.

Franklin testified that prior to Purchase 7, he told Ciampitti he would need a "Type B" residential permit from the Corps, and that they were virtually impossible to get. He also testified that he passed along to Ciampitti the Corps' suggestion that if Ciampitti wanted to know the extent of federal wetlands jurisdiction, he should submit a map of the property and request clarification on designation. Ciampitti declined to follow that suggestion. His reasons for doing so are of note. Ciampitti explained that he wanted to keep his father, one of the partners in DBVA, ignorant of the riparian grant because he knew that if his father was aware of it, he would

be obligated to pass that information on to other partners. He was unwilling to have that information in the hands of the DBVA partners, presumably because he wanted to pay less for Purchase 7. If he publicly sought clarification of the extent of federal jurisdiction and the effect of the riparian grant, the cat would be out of the bag.

Despite his knowledge that the Federal Government might have an interest in regulating Diamond Beach wetlands, Ciampitti was not, he testified, unduly concerned about the need for a federal permit. Two things entered into his thinking. First, he supposed that if a permit was necessary, Speitel would take care of it. Second, he knew that when Olson came onto the site in 1981, there was fill activity, road building, and utility installation going on in Purchase 1. Although the record is not entirely clear how far toward the west this work had proceeded, the fill activity was either within or very near locations over which, as it later developed, the Corps asserted wetlands jurisdiction. (Although Purchase 1 was beyond state wetlands designations, it was partially designated as federal wetlands.) Ciampitti assumed that if Olson was concerned about the need for a federal permit, he would tell Ciampitti.

In part, Ciampitti's sanguine attitude was prompted by the fact that the Corps, unlike the New Jersey Department of Environmental Protection ("DEP"), does not designate in advance lands determined in an authoritative way to be subject to regulation. Unlike the state, the Corps does not file maps in local courthouses. Michael Claffey, a biologist with the Corps, testified that the landowner or developer is expected to ascertain by inquiry whether a permit to fill will be required. He did point out, however, that because New Jersey regulations are somewhat less comprehensive in scope, a state designation of wetlands conclusively means that the site will be protected as federal wetlands. In addition, the Fish and Wildlife Service has made available National Wetlands Inventory Maps, developed from aerial photographs, which reflect vegetation and habitat. The Corps relies on the maps, not as a regulatory device, but as a way to give a quick estimate of whether lands will be regulated. A map showing the property in question was available by 1980. It reflects that the west end of Diamond Beach is estuarine wetlands.

Stephen Whitney, Director of the New Jersey DEP's Division of Coastal Resources, testified concerning the likelihood of getting a permit to fill in state-designated wetlands. He explained that in 1970 the state adopted the New Jersey Wetlands Act, codified at N.J.S.A. 13:9A–1 *et seq.* The effect of the statute, and accompanying regulations, was to restrict dramatically the right of a landowner to fill wetlands. During the 1970's the state began developing maps, based on infrared aerial photography, showing wetlands. This method is based on the presence of certain salt-water dependent vegetation. A map was adopted in 1975 which included the subject property. As indicated above, this map was filed in the county courthouse. Claffey testified that the map is very reliable, and that the wetlands indications were in fact borne out during his three visits to the site in 1987 and 1990.

It is apparent therefore, that whatever notice, constructive or actual, Ciampitti had about state and federal permits in connection with the facts discussed above was acquired well before consummation of Purchase 7 on September 15, 1983. In addition, other events immediately prior to that date are highly relevant.

On September 2, 1983, Ciampitti was at the site and observing fill activities. He encountered at that time an inspector from the Corps, Robert Eckhardt, who told him that the site being filled appeared to be within federal wetlands. Ciampitti did not stop operations, however, and on September 13 Eckhardt returned and instructed a bulldozer operator to quit filling. Eckhardt wrote an order on a scrap of paper, which was given to Ciampitti apparently that same day. Ciampitti testified that he felt he could ignore the order because of the riparian grant and ordered his people to continue filling. On September 15, 1983, the Corps issued a formal cease and desist order. Ciampitti did not receive it until

some time in October. Eventually the district court issued a temporary restraining order. *United States v. Ciampitti,* 583 F.Supp. 483 (D.N.J.1984).

Although Ciampitti did not receive the formal cease and desist order until after Purchase 7 had been consummated, the sale did follow the oral warnings he received on September 2 and 13. The court is forced to conclude that, prior to September 15, 1983, Ciampitti was fully informed of the likelihood that the Corps would assert jurisdiction over lands he was contemplating purchasing.

While other facts were developed through stipulations, documents and testimony, it is unnecessary to set them out because they relate primarily to events after Purchase 7. It is sufficient to state that Speitel applied to the Corps on Ciampitti's behalf for a permit, pursuant to section 404 of the CWA, to maintain existing unauthorized fill, to place substantial additional fill within 11 of the western blocks within Diamond Beach, and to dredge an area for a marina. As part of the approval process, the Corps instructed Ciampitti that the project needed the approval of the DEP. The DEP wrote the Corps on February 6, 1986, advising that the proposed activities would affect state-regulated wetlands, and would be inconsistent with the state's Coastal Zone Management Program ("CZMP"). It was also advised that Ciampitti would have to apply for a separate state wetlands permit. In the Corps' June 5, 1986 denial of a section 404 permit, it recited that the project would contravene federal regulations found at 33 C.F.R. § 320, as well as federal guidelines regulating the discharge of fill or dredged material, and that the project had been determined by the state to be inconsistent with its CZMP. In addition, the Corps observed in a separate Statement of Findings that much of the land in question was subject to state wetlands regulation, yet plaintiff had not yet applied for a state permit. Corps regulations specifically require denial

where independently required state permits are not obtained. 33 C.F.R. § 320.4(j) (1986).

It is undisputed that the plaintiffs have never applied for a state wetlands permit. Ciampitti, acting through Speitel, did, however, apply for a permit pursuant to the New Jersey Coastal Area Facility Review Act of 1973 ("CAFRA"), N.J.S.A. 13:19–1 *et seq.* Ciampitti's CAFRA application was the result of a negotiated settlement of state litigation instigated by the New Jersey DEP. Ciampitti agreed to apply for CAFRA permits for development in two phases. Phase I was to be the uplands area. Phase II was the wetlands area. A permit was eventually granted to develop Phase I, but no permit was granted for Phase II. The CAFRA permit is required for development of fastlands, whereas a wetlands permit is required for fill in state-designated wetlands. Steven Whitney testified that many projects affect both fastlands and wetlands, and thus require both types of permits. Both are submitted to and reviewed by the DEP, however, and he explained that as a practical matter, single permit requests are sometimes allowed to serve double duty.

Whitney testified that the type of uses Ciampitti contemplated for the Phase II area were routinely treated as prohibited by the state. Although counsel for plaintiffs attempted on cross-examination to establish that the regulatory climate was considerably more lax in New Jersey in the early 1980's, he ultimately failed. Whitney explained that the state regulatory regime was well in place by the time Ciampitti made his purchases.[3]

Because trial was limited to the issue of liability, evidence as to damages was restricted. In its bifurcation order, the court informed the parties, however, that evidence as to diminution in value between the time before and after the alleged taking was nevertheless relevant to liability. The parties both put on limited appraisal evi-

---

**3.** Although, as Whitney explained, it was possible then, as it is now, for a landowner to show that state maps are inaccurate, the sort of fine tuning this involves could not, the court finds, have given realistic consolation to Ciampitti in the early 1980's. What Ciampitti needed was a wholesale revision of the map.

dence addressing the question of whether there had been a significant reduction in the value of the property as a result of the Corps permit denial.

Each side presented an appraisal report and testimony by an expert. The two reports were remarkably similar in important respects. Norman LeGore testified for plaintiff that the present value of the wetlands at issue is approximately $200 per acre. The Government's expert, Anthony Graziano, arrived at basically the same conclusion. The wetlands area has only nominal value and is fundamentally commercially unmarketable.

The reports differ in two important respects. First, LeGore also provided the court with a "before" value of the wetlands. This represents the value of the land as if it could be commercially developed at its highest and best use. He testified that the 18 wetlands acres would be worth approximately $6 million. He concludes that the decline in value is virtually 100 percent. Defendant's appraisal made no such assessment because it operated from the assumption that, throughout the period that the land was held by plaintiffs, it was undevelopable. Graziano thus concluded that there had been no destruction in value by virtue of the permit denial.

Defendant's appraisal was also different in that it valued all the property held by plaintiffs at the time of the permit denial, not just the Phase II lands. This is a result of defendant's assertion that the tract at issue here consists not just of those particular wetlands lots as to which a permit was denied, but all Diamond Beach property held by plaintiffs at the time of the permit denial. Defendant's appraisal thus involved over 40 acres, including some prime beach front blocks. Not surprisingly, defendant's appraisal arrives at a figure of approximately $14 million, which is unaffected by the permit denial. Virtually no value was assigned to the wetlands lots before or after the permit denial.

One key difference in assumptions made by the two appraisers concerns their view of the riparian grant. LeGore testified that he was instructed to assume, for purposes of a before value, that the wetlands lots were buildable. He explained that the plaintiff believed the riparian grant overcame regulatory limitations. It was never plain to the court from LeGore's testimony whether, as an appraiser, he believed that a riparian grant would support his "before" value, or whether he was merely relying on the assumption he was instructed to apply. On cross-examination, he testified that he was not aware of any residential development in state-designated wetlands. This is noteworthy given the fact that Graziano explained that such grants are common in the New Jersey coastal area. In addition, LeGore stated that a reasonable and prudent buyer would condition a sale on buildability, something plaintiffs did not do in this instance. In addition, he explained that a reasonable and prudent buyer would know about state-mapped wetlands, and that a developer should assume that no residential construction would be permitted in wetlands.

Graziano was in substantial agreement with LeGore when he testified that, at least after 1980, a reasonable and prudent buyer would have discounted the possibility of using the wetlands for residential development. He disagreed with the assumption behind LeGore's appraisal, however, insofar as the riparian grant is concerned. He was familiar with the form of the grant at issue, as well as others. He stated that having such a grant would not cause wetlands to be appraised at higher values. The grant is seen as merely defining the fee interest of the landowner, he explained. It does not preclude application of the regulatory scheme.

From the appraisal testimony, the court finds that, if the proper comparison is between the value of the wetlands as if they could be developed versus their value after the permit denial, the plaintiff has shown a substantial destruction in value. The question, therefore, is whether that is the proper comparison. For the two independent reasons discussed below, the court concludes that this it is not, and that the plaintiffs have not suffered a taking.

## DISCUSSION

■ The Fifth Amendment provides, in relevant part, that "private property [shall not] be taken for public use, without just compensation." It is well-settled that a taking can be accomplished by governmental regulation. As the Supreme Court wrote in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." In *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980), the Court states that "application of a general zoning law to particular property effects a taking if the ordinance ... denies an owner economically viable use of his land, *see Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 138 n. 36 [98 S.Ct. 2646, 2666 n. 36, 57 L.Ed.2d 631] (1978)."

As the Court taught in *Pennsylvania Coal*, the question of whether the taking reaches "a certain magnitude" is one that is particularly fact dependent. *See* 260 U.S. at 413, 43 S.Ct. at 159. The Supreme Court has "eschewed the development of any set formula for identifying a 'taking' forbidden by the Fifth Amendment, and have relied instead on *ad hoc*, factual inquiries into the circumstances of each particular case." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986). To aid in this determination, certain significant factors have been identified. One that is of particular relevance is "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations...." *Penn Central Transp.*, 438 U.S. at 124, 98 S.Ct. at 2659. These expectations must be "reasonable." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1006, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984); *Deltona Corp. v. United States*, 228 Ct.Cl. 476, 490, 657 F.2d 1184, 1192 (1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982).

From the applicable caselaw, the court discerns two inquiries that must be made with regard to the present facts. First, did the Corps' actions cause a denial of all economically viable use of the property? The second is closely intertwined, but separate: To what extent did the permit denial interfere with distinct, reasonable, investment-backed expectations? A consideration of these questions leads inevitably in this instance to the conclusion that there was no taking.

■ With respect to the first inquiry, before it can be determined whether the permit denial had the effect of taking all economically viable use of the property, the property has to be defined. In *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987), and *Penn Central Transp. Co.*, 438 U.S. at 130–31, 98 S.Ct. at 2662, the Court focuses the inquiry on the "parcel as a whole." Admittedly, in those cases the Court was not directly dealing with a governmental contention that additional land ought to be included in the calculus. Instead, the question was whether certain rights within a "bundle" of rights could be segregated and viewed separately. That same analysis may not always be appropriate in weighing the Government's contention that the analysis should be broadened to include other property held by the plaintiff, but in the court's view, it fits here.

In the case of a landowner who owns both wetlands and adjacent uplands, it would clearly be unrealistic to focus exclusively on the wetlands, and ignore whatever rights might remain in the uplands. If a governmental entity required a buffer, for example, around a housing development, a court would not entertain a separate claim for the land dedicated to buffer. It would no doubt take into consideration the extent to which the whole parcel could be developed. Factors such as the degree of contiguity, the dates of acquisition, the extent to which the parcel has been treated as a single unit, the extent to which the protected lands enhance the value of remaining lands, and no doubt many others would enter the calculus. The effect of a taking can obviously be disguised if the property

at issue is too broadly defined. Conversely, a taking can appear to emerge if the property is viewed too narrowly. The effort should be to identify the parcel as realistically and fairly as possible, given the entire factual and regulatory environment.

Plaintiffs contend that the parcel as a whole consists only of those lots for which a federal permit was sought. These comprise approximately 14 [4] acres of federal wetlands. Plaintiffs' approach explains why the appraisal they have sponsored concludes that the land is currently worth approximately $3,000. The appraisal includes no land that can be developed. More than half of the lands appraised by the Government's expert, on the other hand, consists of buildable lots. Even if the full value assigned by plaintiffs' appraiser to wetlands lots prior to a permit denial (approximately $6 million) were thus added to the Government's appraisal, and then backed out again after denial, plaintiffs would still be left with property worth about $14 million.

Ciampitti testified that his original interests in Diamond Beach were to pursue development of the cheaper, western lots. He set aside that plan, however, when the opportunity arose to take over the assets of DBVA. He did not have the option of purchasing only lots west of Pacific Avenue. The principals of DBVA wanted to disinvest, and Ciampitti was faced with the choice of buying nothing or everything. He opted for the latter primarily because the large financial exposure created by the mortgage was nearly eliminated by the guaranteed purchases of DiDonato. Ciampitti was assured of being able to pay off virtually the entire mortgage. From Ciampitti's perspective, therefore, he was obtaining the wetlands and other lots west of Pacific Avenue at no cost or risk. The western and eastern parts of Diamond Beach were thus inextricably linked in terms of purchase and financing. The eastern half was used by Ciampitti in order

both to get permission to buy the western lots, and to pay for them.

From Ciampitti's standpoint in 1983, therefore, all of Purchase 7 was viewed as a single parcel. Even if Ciampitti justifiably believed that the wetlands lots could be developed residentially, they did not stand alone in his planning. He was forced to buy them and mortgage them as a package.

Of particular note is the decision of the Court of Claims in *Deltona Corp.*, 228 Ct.Cl. at 476, 657 F.2d at 1184. The facts of that case were even more favorable to a finding in favor of the landowner. Deltona Corporation had purchased 10,000 acres on Marco Island in Florida in 1964. The corporation drew up plans for development of 12,000 residential lots on the island. The plans involved substantial dredging and filling. Work was to proceed in five phases. At the time the work commenced, the Corps had limited responsibility or authority to regulate such activities, and permits were routinely granted. Later, however, the Corps denied permits to dredge and fill the Barfield Bay and Big Key areas. In concluding that there had not been a taking as to the latter denials, the court noted,

In the aggregate, Barfield Bay and Big Key contain only 20% of the total acreage of Deltona's original purchase in 1964 and 33% of the developable lots. All the necessary federal permits for the development of the remainder of Marco Island—Marco River, Roberts Bay, and Collier Bay—have been granted. If we focus solely upon the three construction areas which became subject to the new federal restrictions promulgated during the early 1970's—Collier Bay, Barfield Bay, and Big Key—the salient fact emerges that while Deltona has been blocked from going forward at Barfield Bay and Big Key, it has obtained all the necessary clearances for Collier Bay, a tract approximately 25% of the three areas together. Most striking, even within Barfield Bay and Big Key, there are lo-

---

**4.** LeGore's appraisal appraised a total of 18 acres, four of which were not owned by plaintiff.

cated 111 acres of uplands which can be developed without obtaining a Corps permit and whose total market value is approximately $2.5 million.

*Id.* at 490, 657 F.2d at 1192; *see also Jentgen v. United States,* 228 Ct.Cl. 527, 533, 657 F.2d 1210, 1213–14 (1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982). The court thus put into the equation not only those areas as to which dredge and fill permits were denied, but also those areas that had been successfully developed earlier.

■ Although the lack of contiguity between the eastern and western portions is a factor to consider, it is minimized by the fact that, even after Ciampitti began negotiating for Purchase 7, he retained ownership of over half the lots in Purchase 2, which link the eastern and western halves of Purchase 7. In addition, Steven Whitney testified that the DEP will take into consideration the amount of buffer area preserved in considering requests for more intense use of upland space. In any event, the most persuasive consideration is that Ciampitti treated all of Purchase 7, which encompasses virtually all the lots at issue, as a single parcel for purposes of purchase and financing. It would be inappropriate to allow him now to sever the connection he forged when it assists in making a legal argument. Ciampitti is, in effect, asking to isolate the least valuable portion of the purchase when he himself saw the parcels as inextricably linked in September 1983. The court concludes that "the parcel as a whole" must, in this case, include those uplands purchased on September 15, 1983 which Ciampitti still owned as of June 5, 1986. A residual value of $14

million precludes a finding that there was a taking.[5]

■ For a second and independent reason, the court concludes that there was not a compensable taking. Plaintiffs must demonstrate that the permit denials interfered with "distinct investment-backed expectations." *Penn Central Transp. Co.,* 438 U.S. at 124, 98 S.Ct. at 2659. According to the Court, these must be "reasonable" expectations in order to constitute protected property interests. *See id.* at 125, 98 S.Ct. at 2659; *Ruckelshaus,* 467 U.S. at 1006, 104 S.Ct. at 2874. In making this determination, the Supreme Court has made it clear that the degree to which the claimant has advance notice of the government action is relevant. In *Ruckelshaus,* for example, the Court was faced with the argument that the Environmental Protection Agency improperly disclosed proprietary information in connection with licensing a new pesticide. The court held:

> Monsanto could not have had a reasonable, investment-backed expectation that EPA would keep the data confidential beyond the limits prescribed in the amended statute itself. Monsanto was on notice of the manner in which EPA was authorized to use and disclose any data turned over to it by an applicant for registration.
>
> ... If, despite the data-consideration and data-disclosure provisions in the statute, Monsanto chose to submit the requisite data in order to receive a registration, it can hardly argue that its reasonable investment-backed expectations are disturbed when EPA acts to use or disclose the data in a manner that was authorized by law at the time of the submission.

---

5. Even if the court credits the wetlands with a "before" value which assumes their buildability, the remaining value in the upland lots precludes a finding that there was a taking. Defendant's appraiser, without contradiction by any witness for plaintiffs, testified that the uplands were worth approximately $14 million in June 1986. Even though, from plaintiffs' perspective there would have been a decline in value of the large parcel of approximately $5 million, decline in value, alone, is insufficient to constitute a taking. *Penn Central Transp.,* 438 U.S. at 131, 98 S.Ct. at 2662. Although a substantial diminu-

tion of the landowner's ability to recover his basis in the land has been found to constitute a taking, *see Florida Rock Indus., Inc. v. United States,* 21 Cl.Ct. 161, 175–76 (1990) (95 percent reduction in value, less than half of basis remained), here the reduction in value is approximately 25 percent, and the remaining value far exceeds basis. (Government appraised value of uplands, plus plaintiffs' appraised value of wetlands, less the latter after permit denial.) *See generally Jentgen,* 228 Ct.Cl. at 533–34, 657 F.2d at 1213–14.

467 U.S. at 1006–07, 104 S.Ct. at 2874–75. To like effect is *Connolly,* 475 U.S. at 227, 106 S.Ct. at 1027 ("Prudent employers then had more than sufficient notice not only that pension plans were currently regulated, but also that withdrawal itself might trigger additional financial obligations.").

Ciampitti had knowledge of the difficulty attendant upon developing wetlands well before any of the purchases at issue. Purchases 1 and 2 reflect precise gerrymandering by Ciampitti specifically to avoid state-designated wetlands.[6] In addition, he was well aware by 1981 of the distinct possibility that there were federally-regulated wetlands within Diamond Beach. It was only after he became aware of the riparian grant that Ciampitti overcame his caution. Purchases 3 through 7 all included lots wholly or partially within state and federal wetlands. The issue thus framed by Ciampitti is whether his expectations for developing Purchases 3 through 7 were reasonable, in light of the existence of the grant.

In response to a cease and desist order, obtained by the DEP, Ciampitti commenced litigation in the Superior Court of New Jersey, in part seeking a declaration that the riparian grant neutralized the effect of state and federal wetlands regulations. The Superior Court dismissed that count of the complaint upon stipulation of the parties. *Ciampitti v. State of New Jersey,* No. L–032574–84 (Sup.Ct.N.J., order, Jan. 7, 1987). As part of that stipulation, Ciampitti agreed to apply for a state CAFRA permit for both Phases I and II of the proposed development. Ciampitti was no more successful before the district court. That court held that the grant did not operate to block enforcement of federal wetlands regulations. *Ciampitti,* 583 F.Supp. at 483. Graziano testified, moreover, that appraisers in the area do not credit such grants in assuring that wetlands can be developed. Instead, they merely describe the fee interest of the adjacent uplands owner. In addition, no witness, including Ciampitti, could testify of an instance in which a riparian grant was the basis for overcoming regulatory problems. Ciampitti thus misjudged the effect of the riparian grant.

Ciampitti's belief that the grant could serve as a magic talisman to ward off government regulators was unreasonable. He had more than ample warning prior to purchase that the property was encumbered by a likelihood it could not be developed. The court notes that in an Information Certificate from the Commonwealth Land Title Insurance Company for the Diamond Beach property, dated February 21, 1983, Ciampitti was notified that the land was subject to the regulatory powers of the Riparian Commissioners and the State of New Jersey under the Wetlands Act of 1970 and under a *lis pendens* filed in 1973.

To find that the Federal Government has taken a property interest in the form of a distinct, reasonable, investment-backed expectation, would, in this instance, turn the Government into an involuntary guarantor of Ciampitti's gamble. This, the court declines to do.

Once again, the decision of the Court of Claims in *Deltona* is instructive. Unlike the circumstances here, Deltona Corporation purchased the land well before a strict regulatory regime had developed. Nevertheless, the court writes,

> [W]hen Deltona acquired the property in 1964, it knew that the development it contemplated could take place only if it obtained the necessary permits from the Corps of Engineers. Although at that time Deltona had every reason to believe that those permits would be forthcoming

---

**6.** The court has held, in connection with denying defendant's motion for summary judgment, that the denial by the DEP of a CAFRA permit, and notification to the Corps that Ciampitti's proposal to the Corps was inconsistent with the CZMP were not a *per se* defense by the Government to a claim under the Fifth Amendment. The court held, however, that the state regulatory scheme could be relevant in determining whether plaintiffs had a reasonable, investment-backed expectation that they could develop the property. *Ciampetti v. United States,* 18 Cl.Ct. 548, 558 n. 17 (1989) (the caption in the present case uses the proper spelling of Robert Ciampitti's name; the cited decision involves a misspelling due to an error in spelling in the original pleadings).

when it subsequently sought them, it also must have been aware that the standards and conditions governing the issuance of permits could change. Deltona had no assurance that the permits would issue, but only an expectation....

In *Penn Central Transp., supra,* the Supreme Court rejected as "quite simply untenable" the contention that property owners "may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development...." *Supra,* 438 U.S. at 130 [98 S.Ct. at 2662] (citation omitted). That is precisely this case. Deltona has been denied the ability to exploit its property by constructing a project that it therefore had believed "was available for development."

*Deltona,* 228 Ct.Cl. at 491, 657 F.2d at 1193.

A final observation is also relevant. At the time of Purchase 7, DBVA apparently assigned very little value to the western wetlands lots. They could be redeemed from the mortgage at a fraction of the amount assigned to eastern lots. (Wetlands blocks could be redeemed for approximately $35,000, whereas eastern blocks required $200,000 to $500,000.) Ciampitti's investment, particularly in view of the guaranteed sales to DiDonato, was virtually nil in the wetlands. Not only does this minimize the "investment-backed" element of proof, it suggests that in fact plaintiffs' expectations concerning development were unreasonable.

## CONCLUSION

Plaintiffs have not shown that the Corps' denial of a section 404 permit constituted a compensable taking. The Clerk is directed to enter judgment dismissing the complaint. No costs.