**MACHIPONGO LAND AND COAL COMPANY, INC. and the Victor E. Erickson Trust and Joseph Naughton, Petitioners,**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL RESOURCES, the Environmental Quality Board and Arthur A. Davis, Secretary of Environmental Resources, Respondents.**

Commonwealth Court of Pennsylvania.

Argued June 8, 1998.

Decided Sept. 30, 1998.

As Amended Oct. 1, 1998.

Reargument Denied Oct. 30, 1998.

Carl A. Belin, Jr., Clearfield, Joel R. Burcat, Harrisburg, for petitioners.

Richard P. Mather, Joseph Pizarchik, Harrisburg, for respondents.

Before PELLEGRINI and KELLEY (P.), JJ., and RODGERS, Senior Judge.

PELLEGRINI, Judge.

Before this Court is a motion for summary judgment filed by the Commonwealth of Pennsylvania, Department of Environmental Protection (DER), the Environmental Quality Board (EQB) and Arthur A. Davis, Secretary of the Department of Environmental Resources (collectively, the Commonwealth) in response to a petition for review filed by Machipongo Land and Coal Company, Inc., the Victor E. Erickson Trust and Joseph Naughton (collectively, Coal Owners) challenging a regulation designating portions of their land unsuitable for surface mining.

On May 26, 1989, the Commonwealth received from the Brisbin Recreation Board and the Locust Grove Sportsmen Club "A Petition To Declare Areas Unsuitable For Mining" in which they requested that the entire 2.86 square mile Goss Run Watershed (Watershed) be protected from coal mining so as to protect the quality of the water of the Goss Run stream and the Brisbin Dam and Recreational Park.[1] Coal Owners requested and were granted intervenor status because they owned surface and mineral rights in the Watershed that could potentially be affected. Specifically, Machipongo

owned 2,037 acres of land in Clearfield County of which 157 acres had mineral rights in the Watershed and Erickson and Naughton owned 1,350 acres in Clearfield County of which 27 acres had mineral rights in the Watershed.

After public hearings were held, the DER conducted a detailed study of the proposed designated area as required by Section 4.5(g) of the Pennsylvania Surface Mining Conservation and Reclamation Act (PaSMCRA), Act of May 31, 1945, P.L. 1198, *as amended,* 52 P.S. § 1396.4e(g). Essentially, the results of the study indicated that surface coal mining of the Watershed upstream of the Brisbin Dam had significant potential to disrupt the hydrologic balance causing decreases in the net alkalinity of discharges from abandoned Lower Freeport underground mines and destroying the habitat for wild trout populations. It also had a high potential to cause increases in dissolved solids and metals concentrations in Goss Run that would adversely affect the use of the stream as an auxiliary water supply. The DER recommended that the EQB approve a proposed regulation designating the surface mineable coals located within the Watershed upstream of the Brisbin Dam as unsuitable for surface mining of coal and submitted that recommendation to the General Assembly. The EQB approved the proposed regulation, and after a period of public comment, the General Assembly also approved the notice of proposed rulemaking and adopted a final regulation designating a portion of the Watershed unsuitable for mining (UFM) as set forth at 25 Pa.Code § 86.130(h)(14).[2] That designation was made pursuant to Section 4.5(b) of the PaSMCRA, 52 P.S. § 1396–4e(b), that permits the Commonwealth to designate an area as unsuitable for surface mining.

---

1. More specifically, the petition alleged that surface mining within the Watershed would adversely affect the Goss Run stream water quality and the Brisbin Dam and Recreational park; would adversely affect a recreational stocked trout fishery maintained by the Pennsylvania Game Commission; and would adversely affect wildlife habitat in the Watershed reducing its values for hunters, hikers and others who used the Watershed because of its aesthetic woodlands.

2. That section provides:

   The surface mineable coal reserves within the Goss Run watershed upstream of the Brisbin Dam, including a small tract of land within the watershed of the West Tributary to Goss Run, a total of approximately 555 acres, are designated unsuitable for all types of surface mining operations.

   The regulation was published as final in the Pennsylvania Bulletin on May 3, 1992. *See* 22 Pa. B. 2715.

Subsequently, on July 1, 1992, Coal Owners filed a petition for review against the Commonwealth in our original jurisdiction seeking equitable and declaratory relief challenging the regulation designating that certain portions of land they owned in the Watershed were unsuitable for surface mining. They alleged that 157 acres of the 2,037 acres of land owned by Machipongo in the south reserves of the Watershed had mineral rights that were within the UFM designated area and could not be mined, resulting in a taking of at least 1,344,800 tons of its coal valued at $2,846,550. Similarly, 27 acres of the 1,350 acres owned by Erickson and Naughton in the north reserves of the Watershed could not be mined, resulting in a taking of at least 377,900 tons of their coal valued at $566,850. Based on Coal Owners' inability to mine any of their coal located within the UFM designated area, they alleged that the regulation implementing the designation constituted a taking without just compensation and a violation of their due process rights. They requested, among other things, that this Court enjoin the enforcement of the regulation as an unconstitutional taking of their property or remand the case to the trial court to determine the value of the property taken as a result of the adoption of the regulation.[3]

After much litigation as to the proper forum to hear this case, our Supreme Court remanded it to us for resolution.[4] The Commonwealth has now filed a motion for summary judgment that is presently before this Court.[5] It contends that the regulation is not a taking because the UFM designation was adopted for a public purpose, provides protection to the Watershed and is not unduly oppressive. It also argues that the designation does not deprive Coal Owners of all beneficial use of their land because the designated area only comprises 8% of the total land owned by Machipongo and 2% of the land owned by Erickson and Naughton in Clearfield County. Because it avers that the majority of Coal Owners' land is adjacent to the designated area, the Commonwealth contends they have not lost all economical use of their land. It further argues that even if we only consider the designated land for purposes of a taking, because Coal Owners still

3. Coal Owners also requested that we order the Commonwealth to adopt regulations containing constitutional safeguards for affected landowners and to declare the regulation void; or order the Commonwealth to hold a hearing with constitutional guarantees to determine whether the regulation should be adopted.

4. In response to Coal Owners' petition, the Commonwealth filed preliminary objections alleging, *inter alia*, that this Court lacked jurisdiction to hear the case. While holding we had jurisdiction, we granted the preliminary objections and transferred the matter to the Environmental Hearing Board (EHB) for disposition under the doctrine of primary jurisdiction because it had the expertise to rule on the validity of the surface mining taking claims. See *Machipongo Land and Coal Co., Inc. v. Commonwealth, Department of Environmental Resources*, 155 Pa.Cmwlth. 72, 624 A.2d 742 (Pa.Cmwlth.1993) (*Machipongo I*).

Both the Commonwealth and Coal Owners filed appeals with the Supreme Court arguing that the transfer of the case to the EHB was erroneous. Coal Owners argued that their taking claims should be addressed by the courts while the Commonwealth argued they should be addressed by the DER. By order dated October 11, 1994, the Supreme Court reversed our decision and referred the case to the Court of Common Pleas of Clearfield County for further proceedings under the Eminent Domain Code, Act of June 22, 1964, Special Sess., P.L. 84, *as*

amended, 26 P.S. §§ 1–101 – 1–903. See *Machipongo Land and Coal Co., Inc. v. Commonwealth, Department of Environmental Resources*, 538 Pa. 361, 648 A.2d 767 (1994) (*Machipongo II*). The Commonwealth filed an application for reargument alleging that this Court, rather than the trial court, had jurisdiction to hear this matter. The Supreme Court granted reargument and by order dated May 21, 1996, vacated its earlier decision. See *Machipongo Land and Coal Co., Inc. v. Commonwealth, Department of Environmental Resources*, 544 Pa. 271, 676 A.2d 199 (1996) (*Machipongo III*). It then remanded the case to this Court for further proceedings on the basis that the regulation upon which the Coal Owners were making their challenges was promulgated under the Commonwealth's police power rather than the Eminent Domain Code and did not fall within an enumerated exception to Section 761(a)(1) of the Judicial Code, 42 Pa.C.S. § 761(a)(1).

5. Summary judgment is appropriate when there is no genuine issue of material fact and the movant clearly establishes its entitlement to judgment as a matter of law. *Mason & Dixon Lines, Inc. v. Mognet*, 166 Pa.Cmwlth. 1, 645 A.2d 1370 (Pa.Cmwlth.1994). When considering a motion for summary judgment, the court must examine the record in the light most favorable to the nonmoving party, accepting as true all well-pleaded facts and all inferences to be drawn therefrom. *Id.*

have use of their surface rights for that land and because it can be used for purposes other than mining such as for the sale of lumber, it still has value and Coal Owners have not been denied all beneficial use of their land.

Not denying at this time that the regulation allowing for the UFM designation is valid, Coal Owners argue that a taking has occurred because they have been deprived of their right to surface mine their coal in the designated area and, therefore, have been denied all economical use of that land. They contend this is so because Pennsylvania recognizes coal as a separate estate in land and whether they can still utilize the surface rights of their land in the designated area is irrelevant.

### I.

■■■ Both the Fifth Amendment to the United States Constitution and Article 1, Section 10 of the Pennsylvania Constitution expressly provide that private property may not be taken under the powers of eminent domain for public use without payment of just compensation.[6] A taking occurs when the entity clothed with the power of eminent domain substantially deprives an owner of the use and enjoyment of his property. *Machipongo III.* A taking may also occur if a regulation enacted for a public purpose under the government's police powers prevents the landowner from using his land.[7] In *Machipongo III*, our Supreme Court held that Section 4.5(b) of the PaSMCRA, which allowed the Commonwealth to designate the

Watershed as unfit for mining, was an act deemed to be an exercise of its police power.

The test for determining whether a regulation amounts to a taking and requires the payment of just compensation has evolved over the years. The test, which was first established in *Lawton v. Steele,* 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894), has come to be known as the "traditional" takings analysis. In *Lawton,* the United States Supreme Court set forth the following factors to be considered when determining whether a regulatory taking had occurred:[8] 1) whether the public interest required such interference; 2) whether the means chosen were reasonably necessary for the accomplishment of the purpose; and 3) whether the means chosen were not unduly oppressive on individuals. In deciding whether the public interest required protection, the Court noted that it had to be determined whether the use of the property violating the regulation constituted a public nuisance and, if so, whether the property was subject to abatement. This traditional test involved a balancing of interests by the courts and required a case-specific inquiry into the public interest advanced by the regulation. If the public interest advanced was greater than the rights lost by the individual, the regulation was not a taking and compensation was not owed.[9]

The Supreme Court continued to utilize the traditional test in *Pennsylvania Coal v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), one of the first cases dealing with coal estates and regulatory takings. In that case, a residence deeded to Mahon stood on

---

6. The Fifth Amendment to the United States Constitution states: "nor shall private property be taken for public use, without just compensation." Article 1, Section 10 of the Pennsylvania Constitution provides: "nor shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured."

7. The government's police power arises from the Fourteenth Amendment to the United States Constitution and Article 1, Section 1 of the Pennsylvania Constitution.

8. *Lawton* involved a regulation in New York that protected certain species of fish by prohibiting fishing in specific areas. Plaintiffs challenged the constitutionality of the regulation after their

$15 fishing rods were taken and destroyed because they were used in violation of the regulation.

9. *See also Miller & Son Paving, Inc. v. Plumstead Township,* 552 Pa. 652, 717 A.2d 483 (1998), where our Supreme Court recently utilized the test set forth in *Lawton* with the following minor modifications: 1) the interest of the general public, rather than a particular class of persons, must require governmental action; 2) the means must be necessary to effectuate that purpose; and 3) the means must not be unduly oppressive upon the property holder, considering the economic impact of the regulation, and the extent to which the government physically intrudes upon the property.

property that had coal below that was owned by a coal company. While the deed of the property conveyed the surface rights to Mahon, it expressly reserved the right by the coal company to remove all the coal under that property with Mahon assuming the premises with the risks and waiving all claims for damages as a result of the mining. Subsequently, the Kohler Act was enacted and prevented the coal company from removing the coal if it would cause subsidence of any structure used as a human habitat. After the coal company brought an action and the state Supreme Court found that the regulation was constitutional, but the coal company had contract and properly rights also protected by the Constitution, Mahon appealed.

The Court performed a balancing test stating that the extent of the public interest shown by the regulation was limited because it ordinarily did not apply to land when the surface was owned by the owner of the coal. It also determined that the source of damage to the house was not a public nuisance even if similar damage was inflicted on others in different places because it was neither common nor public. Stating that "[f]or practical purposes, the right to coal consists in the right to mine it," *Id.*, 260 U.S. at 414, 43 S.Ct. 158, the Court determined that if anyone was so shortsighted as to only acquire surface rights without the right of support, the owner of the coal rights would have to be compensated because all of its coal would be taken. The Court ultimately held that the regulation was a taking and concluded, "[t]o make it commercially impracticable to mine certain coal has very nearly the same effect for constitutional purposes as appropriating or destroying it." *Id.*

Many years later, in *Penn Central Transportation Company v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), *reh'd denied*, 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978), the Supreme Court again had the opportunity to apply the balancing test when addressing New York City's Landmarks Preservation Law as it applied to Grand Central Terminal. Penn Central, which owned the Terminal, wanted to construct an additional 50 stories on top of the Terminal but was denied the appropriate permits due to the preservation regulation. It appealed arguing that the regulation had taken its property for public use without just compensation in violation of the Fifth Amendment because it had taken its right to air space. Utilizing the balancing test, the Court held that the regulation did not amount to a taking because the preservation of historical buildings was related to the promotion of the general welfare and the Terminal was still economically viable—i.e., it could still be used for its intended purpose without any loss of profit from its continued use. It also noted that the regulation did not interfere with Penn Central's investment-backed expectations because development rights that had been denied to Penn Central for the Terminal had been made transferable to numerous other sites in the vicinity of the Terminal.[10]

What was notable about the *Penn Central* case was that it expanded the third prong of the balancing test to include a determination of whether there was some economic value left to the landowner's property, not just a determination of whether the landowner was "unduly oppressed." The test in that form was utilized by the Supreme Court in *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), when it again had the opportunity to address whether a regulation dealing with coal rights constituted a taking. *Keystone* involved Pennsylvania's Bituminous Mine Subsidence and Land Conservation Act, 52 Pa.C.S. § 1406.6, an Act that strictly regulated coal mining in areas that were subject to subsidence and required that 50% of the coal under structures be left in place to prevent subsidence from occurring. The Coal Association argued that it was being denied the right to mine 27 million tons of coal, and that the Court should rely on its holding in *Mahon* to find that the Act constituted a taking

---

**10.** The Court did not reach the issue of whether there had been a taking of the air space because even though the permits had been denied for the construction of an additional 50 stories, the Commission had not indicated that approval would be denied for a smaller structure that had not yet been sought.

for which it was entitled to compensation. Relying on the test enunciated in *Penn Central*, the Court stated:

> Because our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions in determining how to define the unit of property "whose value is to furnish the *denominator* of the fraction." (Emphasis added.)

*Id.*, 480 U.S. at 497, 107 S.Ct. 1232.

Although the Court apparently looked at the contiguous land owned by the Coal Association as well as the regulated land, it did not explain why the total land owned was used as the denominator of the fraction. It then concluded that there was no regulatory taking because the Coal Association had not lost *all* viable economical value use of its land as it had never claimed their mining operations had been unprofitable since the Act was passed or that mining in any specific location affected by the 50% rule had been unprofitable. Additionally, it still possessed mineral rights in the regulated area that could be mined profitably and there had been no undue interference with its investment-backed expectations. Finally, the Court held that

the Act required coal to be left in place for legitimate public safety reasons.

After *Keystone*, the traditional test had evolved to require a determination of whether the landowner had any economically viable use of his land remaining.[11] If the land was totally valueless, then a *per se* taking had occurred. However, if some value remained and the landowner's investment-backed expectations had not been interfered with, a balancing test was still required to determine whether the public's interest was greater than the landowners' diminution of land.[12]

The last and most recent case decided by the Supreme Court in the area of regulatory takings is *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). In *Lucas*, the Court was faced with deciding whether a regulation that took 100% of the value of landowner's property constituted a taking. Landowner paid $975,000 for two residential lots in South Carolina on which he planned to build single-family homes. After the purchase of the property, the Beachfront Management Act was enacted to prevent erosion and had the effect of preventing Lucas from building any structures on his properties and rendering those properties worthless. Lucas filed suit

---

**11.** One year after *Keystone* was decided, this Court in *McClimans v. Board of Supervisors of Shenango Township*, 107 Pa.Cmwlth. 542, 529 A.2d 562 (Pa.Cmwlth.1987), had the opportunity to utilize the test set forth in *Keystone* to decide whether the inability to mine coal constituted a regulatory taking. In that case, McClimans leased to Amerikohl the right to remove coal on their property. Subsequently, the Township enacted an ordinance that stated surface mining was not a permitted use in the R–1 zone in which the property was located. McClimans argued that if the coal on its land could not be mined, the ordinance constituted a taking. On appeal, we relied on *Keystone* and held that if the McClimans' coal could not be mined, the ordinance would constitute a taking. However, because it had not yet been determined whether there were alternative means to reach the coal other than through surface mining, the case was remanded for that determination.

Relying on footnote 4 in *McClimans*, the dissent contends that it stands for the proposition that the three separate estates in land are without significance in a taking analysis. However, footnote 4 of that opinion states:

> While the significance of the distinction between the coal estate and the surface estate

remains viable for land use regulation purposes the **significance of the support estate seems to have been obliterated**, at least for purposes of deciding taking issues under the *federal* constitution ... (Italics in the original; bold added.)

This statement is merely a comment on what the United States Supreme Court stated in *Keystone*. *See* footnote 26.

**12.** The fraction for determining whether a taking has occurred has been expressed as follows:

> [A] court must compare the loss of property use resulting from a regulation, x, to the sum of all usage rights inherent in a piece of property, y. If x/y equals 1, then a taking has occurred; if x/y is something less than 1, the property owner is entitled to nothing. If the relevant property interest, y, is defined narrowly enough, as, for example, only those rights that have been regulated away, then a taking will always have occurred ... On the other hand, if the relevant property interest is defined broadly enough, a regulatory taking will never occur.

Comment, *Unearthing the Denominator in Regulatory Takings Claims*, 61 U. Chi. L.Rev. 1535, 1536 (1994).

arguing that even though the Act was valid because it was a lawful exercise of police power, it resulted in a taking of his property without just compensation because his properties were valueless.

Not discussing the investment-backed expectation factor but recognizing that there was a *per se* taking if the owner of the property was required to sacrifice all economical beneficial use of his land,[13] the Court went on to hold that if the regulation prohibited the use under nuisance law, there would be no taking even if it had the effect of totally depriving the landowner of all beneficial use. Just as it had originally analyzed regulatory takings in *Lawton*, the Court in *Lucas* also found that if the use constituted a nuisance, the public's interest prevailed regardless of what the landowner had lost.

■ After *Lucas*, then, the test to determine whether there is a regulatory taking is based on the following factors:

- whether the public interest requires regulatory interference with the property right;
- whether the regulation is reasonably related to that goal;
- whether the amount of property taken deprives an owner of *all* economical viable uses of the property, measured by what was taken (the numerator) against what was left (the denominator); and
- whether property owner's actions or proposed actions would cause a nuisance.[14]

## II.

In this case, Coal Owners aver that just as in *Lucas*, they, too, have lost all viable economical use of their land because coal is a separate estate in land and they have no access to mine any of their coal in the desig-

nated area. The Commonwealth, however, argues that the coal estate is part of the entire parcel of land owned by Coal Owners, including the surface rights and the property owned adjacent to the designated area, and that entire parcel is the proper "denominator" to be used to decide if all economical use is gone.

The difficulty in determining the land to be used as the denominator in deciding if there is a deprivation of all economical beneficial use of land was recognized by the Court in *Lucas:*

> Regrettably, the rhetorical force of our "deprivation of all economically feasible use" rule is greater than its precision, since the rule does not make clear the "property interest" against which the loss of value is to be measured. When, for example, a regulation requires a developer to leave 90% of a rural tract in its natural state, it is unclear whether we would analyze the situation as one in which the owner has been deprived of all economically beneficial use of the burdened portion of the tract, or as one in which the owner has suffered a mere diminution in value of the tract as a whole.

*Id.,* 505 U.S. at 1016, 112 S.Ct. 2886.

In attempting to resolve this difficulty, the Courts have addressed the problem of deciding how the denominator is determined in a regulatory takings case, but they have never agreed on the appropriate method for determining that portion of the fraction and have provided little in the way of guidance. Essentially, though, they have all utilized one of the following three approaches: 1) the contiguous land under a common owner approach; 2) the property interest as defined by the regulation; and 3) the multi-factor analysis.

*United States,* 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984).

---

**13.** "The principle that underlies this doctrine is that while most burdens consequent upon government action undertaken in the public interest must be borne by individual landowners as concomitants of the advantage of living and doing business in a civilized community, some are so substantial and unforeseeable and can so easily be identified and redistributed, that justice and fairness require that they be borne by the public as a whole." *Kirby Forest Industries, Inc. v.*

**14.** *But see* Kanner, *Hunting the Snark, Not the Quark: Has the U.S. Supreme Court Been Competent in Its Effort to Formulate Coherent Regulatory Takings Law?*, The Urban Lawyer, Vol. 30, No. 2, 307 (1998) (Supreme Court decisions in regulatory takings law are incoherent and cannot be rationalized).

The Commonwealth urges us to adopt the "contiguous land under a common owner approach," a bright line test that looks at all of the property the landowner owns, including both the regulated land and any contiguous land that is not regulated—in this case, surface rights. The denominator of the fraction becomes the total property owned by the landowner. The only calculation then that has to be done is to compare the percentage of land regulated (the numerator) by the total land owned (the denominator).[15]

While this is an easy approach to take, there are impediments to its use. First, there is a facial unfairness in this approach. For example, consider the following: there are two contiguous properties, parcel A consisting of 10 acres and adjacent parcel B consisting of 100 acres, both owned by different individuals. The Commonwealth enacts legislation barring development of a 20–acre area for a valid state purpose but depriving landowner(s) of any economically beneficial use. The 20 acres that are protected by statute turn out to encompass all 10 acres of parcel A and only 10 acres of Parcel B's 100 acres. Under this approach, the landowner of parcel A would be compensated for a total taking of parcel A while the landowner of parcel B would not be compensated at all because his percentage of total acreage owned far outweighs the regulated land, resulting in a *de minimis* taking of only one-tenth of his property.

Another problem this approach presents is how to treat contiguous property previously owned by the landowner that was either developed or "sold off." This problem was illustrated in *Deltona Corporation v. United States*, 228 Ct.Cl. 476, 657 F.2d 1184 (Ct.Cl. 1981), where Deltona purchased a 10,000 acre parcel on the Florida Gulf coast with the intention of developing 12,000 single-family homes. It divided the land into five parcels, obtained the requisite permits, and sold the

individual tracts in one area. However, the Army Corps of Engineers subsequently denied requests to develop two other parcels in order to preserve wetlands. Arguing on appeal that because they could not develop the property there had been a taking of that property, the Court of Federal Claims determined that the relevant parcel for determining the denominator was the entire 10,000 acre tract originally purchased by Deltona, even though it had previously sold a portion of that land. Using land once owned by the landowner to arrive at a denominator ignores that the property no longer belongs to the landowner to do with as he pleases.

The second approach, which the Coal Owners urge us to adopt—defining the property interest by the regulation—is also a bright line test that only uses the regulated land as the denominator. Just as with the first approach, the benefit of this test is that it is one easily applied by the courts because they need only determine the actual land within the regulated area. This approach, however, has the downside that almost any regulation can result in a take, e.g., a set-back requirement in a zoning ordinance could result in a take because it does not balance the public's interest with private property rights.

The third approach—the multi-faceted approach—considers various factors in determining the denominator. They include whether the landowner had investment backed expectations;[16] whether any land that could be part of the denominator was sold or developed prior to the regulation's enactment or enforcement;[17] the dates of acquisition;[18] the extent to which the parcel has been treated as a single unit;[19] and the extent to which the protected land enhances the value of the remaining land.[20] Just like any test that balances various considerations on an ad hoc basis, the multi-faceted approach fails to offer either regulators or property owners any certainty as to whether

**15.** *See Jentgen v. United States*, 228 Ct.Cl. 527, 657 F.2d 1210 (Ct.Cl.1981).

**16.** *See Florida Rock Industries. v. United States*, 18 F.3d 1560 (Fed.Cir.1994).

**17.** *See Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171 (Fed.Cir.1994).

**18.** *See American Savings & Loan Association v. Marin County*, 653 F.2d 364 (9th Cir.1981).

**19.** *See Ciampitti v. United States*, 22 Cl.Ct. 310 (1991).

**20.** *Id.*

a regulation will result in a taking. It also has some of the same disadvantages as the contiguous land approach in that the outcome is determined by the status of those who own the land and their "expectations."

■ Of these three approaches, we believe the property interest by regulation approach is the best one to determine the denominator, but with some important modifications to take into consideration the need for governmental regulation in the public interest. Although this approach tilts in the landowner's favor, "historically the Takings Clause was designed to protect private citizens from governmental interference with property rights. Therefore, it makes sense for courts, at least initially, to tip the scales slightly in the plaintiff's favor." [21] However, while the regulated land would first be considered under this approach, to determine whether it actually would be the denominator would depend on the answers the courts received to the following questions: [22]

- whether the regulated land had value prior to the regulation;
- whether the regulated land has a separate use from the non-regulated contiguous parcel(s)—i.e., whether it may be profitably used if it is the only parcel; and
- if the regulated land has value separate from the contiguous land, whether all of its economic benefit is gone.

If the regulated land had no value prior to the regulation because it had no viable use, it could not serve as the denominator and there would be no taking because the regulation would not have deprived the landowner of its use. However, if the regulated land had an economically viable use separate and apart from any other contiguous land that was owned and became valueless after the regulation, it would become the denominator in the fraction and there would be a taking. Under our test, if the Commonwealth could show that Coal Owners had other access to mine their coal, then the land would not be value-

less and there would be no taking. This approach is best because it fosters predictability, focuses on the effect of the governmental regulation on the property and not on the circumstances of the property owner, and results in fairness because it treats all property owners the same.

### III.

Because we have determined that only the regulated land is to be considered in determining the denominator, we must next determine how to treat Coal Owners' coal estate in the UFM designated area. The Commonwealth suggests we should calculate the denominator based on finding Coal Owners' rights in the coal estate are just part of the bundle of rights they own in land. If we were to do so, there would be no taking because Coal Owners do not dispute that they still have surface rights that can be used and they would not be deprived of all economical beneficial use of their land. If, however, we were to agree with Coal Owners that it did not matter what other estates in land they owned because the coal estate was treated as a separate estate, then there would be a taking because they would be deprived of their right to mine that land.

■ In most other states, coal estates are not treated as separate estates from surface estates. However, Pennsylvania is unique from other states in that it has long recognized three separate estates in land—surface, coal/mineral and the right to support. *Commonwealth v. Fitzmartin*, 376 Pa. 390; 102 A.2d 893 (1954); *Stabler Development Company v. Board of Supervisors of Lower Mt. Bethel Township*, 695 A.2d 882 (Pa.Cmwlth.1997); *Millcreek Township v. N.E.A. Cross Company*, 152 Pa.Cmwlth. 576, 620 A.2d 558, n. 8 (Pa.Cmwlth.1993); *Gardner v. Commonwealth of Pennsylvania, Department of Environmental Resources*, 145 Pa.Cmwlth. 345, 603 A.2d 279 (Pa.Cmwlth. 1992). All three estates may be owned separately, *Fitzmartin*, and taxed separately,[23]

---

**21.** Lisker, *Regulatory Takings and the Denominator Problem*, 27 Rutgers L.J. 663, 720 (1996).

**22.** This approach is suggested in Comment, *Unearthing the Denominator in Regulatory Takings Claims, supra.*

**23.** *See Bannard v. New York State Natural Gas*

although the right to support is generally owned by either the owner of the surface or coal estate.[24] Owners of coal estates that do not own the surface rights have the right to remove the coal by using portions of the surface as reasonably necessary to remove the coal. *Greek v.* Wylie, 266 Pa. 18, 109 A. 529 (1920); Baker *v. Pittsburg, C. & W.R. Co.*, 219 Pa. 398, 68 A. 1014 (1908). Because separate estates create separate interests, the appropriate denominator by which to determine whether Coal Owners have lost all viable economic use of their land is solely the coal estate in the UFM designated area.

## IV.

In this case, using the regulated land standard to determine whether there is a taking would result in the following fraction:

> the interest in coal taken (numerator)
> the regulated land (denominator)

If the result of the fraction is 1, then a taking has occurred; conversely, if the fraction is anything less than 1, no compensatory taking has occurred and we would grant the Commonwealth's motion for summary judgment.[25]

However, because there are several facts that are not before us, we are unable to calculate the value of the fraction. To make that calculation, it must be determined if the coal estate had value prior to the UFM designation, whether it had a separate use from the non-regulated contiguous land Coal Owners owned, and whether all of its economic benefit was gone as a result of the regulation. If, after that determination is made, the result of the fraction is less than 1, then a taking has not occurred. In this case, specific evidence would have to be adduced as to whether the coal can be extracted by subsurface mining; whether the land in the regulated area cannot be surface mined without using the contiguous parcel; and whether the grade of coal is insufficient in amount or quality to economically mine. With that evidence, the denominator can be fixed and we can then determine whether the regulation has resulted in an unconstitutional taking and either enjoin the regulation or find that the Commonwealth's UFM designation is a permissible regulatory restriction on the use of the land.[26]

---

*Corporation*, 448 Pa. 239, 293 A.2d 41 (1972) (mineral estate became subject to separate taxation when it was severed from surface estate).

**24.** In *Keystone*, the United States Supreme Court, commenting about how Pennsylvania law treated the support estate and tied it to either the surface or mineral rights, stated:

> The Court of Appeals, which is more familiar with Pennsylvania law than we are, concluded that as a practical matter the support estate is always owned by either the owner of the surface or the owner of the minerals. It stated: "The support estate consists of the right to remove the strata of coal and earth that undergird the surface or to leave those layers intact to support the surface and prevent subsidence. These two uses cannot co-exist and, depending upon the purposes of the owner of the support estate, one use or the other must be chosen. If the owner is a mine operator, the support estate is used to exploit the mineral estate. When the right of support is held by the surface owner, its use is to support that surface and prevent subsidence. Thus, although Pennsylvania law does recognize the support estate as a 'separate' property interest, it cannot be used profitably by one who does not also possess either the mineral estate or the surface estate."

*Id.*, 480 U.S. at 501, 107 S.Ct. at 1250.

We need not address here whether the Supreme Court's interpretation of Pennsylvania law in this area is accurate.

**25.** Most courts have required that the fraction be reduced to 1 in order for there to be a taking and compensation paid. *See, e.g. Lucas, supra; Deltona, supra.* However, the Federal Circuit Court appears to allow the payment of compensation for a taking when the result is somewhat less than 1. *See Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171 (Fed.Cir.1994); *Florida Rock Industries v. United States*, 18 F.3d 1560 (Fed.Cir.1994).

**26.** The Commonwealth also contends that if we find the regulation restricts Coal Owners' ability to mine their coal, we should only find that there has been a temporary taking because regulatory takings are temporary in nature and only exist until invalidated by a court. In response, Coal Owners argue that they are not seeking to invalidate the regulation and only seek compensation for a total taking of their coal estate. Not only is Coal Owners' argument at variance with the relief sought in their petition for review, but it is beyond this Court's jurisdiction if we find the regulation null and void as a taking. Our jurisdiction only extends to the validity of the regulation. Once the regulation is declared invalid, the nature of the take and compensation due must be determined in a petition for the appointment of a

Because genuine issues of material facts still remain as to whether the Commonwealth's designation of Coal Owners' property as unsuitable for mining resulted in a taking, the motion for summary judgment filed by the Commonwealth is denied.

### ORDER

AND NOW, this 30th day of September, 1998, the motion for summary judgment filed by the Commonwealth of Pennsylvania, Department of Environmental Protect, the Environmental Quality Board and Arthur A. Davis, Secretary of the Department of Environmental Resources, in response to the petition for review filed by Machipongo Land and Coal Company, Inc., the Victor E. Erickson Trust and Joseph Naughton, is denied.

RODGERS, Senior Judge, dissenting.

I respectfully dissent.

The only issue before this Court is whether the Commonwealth is entitled to summary judgment because the petitioners, Machipongo and Erickson–Naughton, have failed to produce evidence that the Commonwealth has deprived them of all beneficial use of their land by means that are unduly oppressive.

The petitioners claim that a regulation of the Environmental Quality Board which designated a small portion of their property as unsuitable for surface coal mining entitles them to millions of dollars in compensation based on a royalty on every ton of coal allegedly taken by the regulation.

The thrust of the petitioners' argument, accepted by the majority, is that the only use of an estate in coal is the right to mine it, and that any regulation, regardless of its merit, that takes away such right to the slightest extent, requires full monetary compensation, because they have been deprived of all bene-

ficial use of their property, citing *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

Until 1987, the only available remedy for a regulation that went 'too far' was invalidation of the regulation. *First English Evangelical Lutheran Church v. Los Angeles County,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). Recently, in *Miller & Son Paving Inc. v. Plumstead Township,* 552 Pa. 652, 717 A.2d 483 (1998), the Supreme Court of Pennsylvania held that even though a township zoning ordinance prohibiting the mining of rock was invalid, the property owner was not entitled to money damages for a temporary taking, because other uses clearly existed, and that a holding to the contrary could have a chilling effect on land use planning.

Our Court has acknowledged that for the purpose of deciding taking issues under the federal constitution, the vertical division recognized in Pennsylvania law that coal, surface, and the right to support are three separate estates is without significance. *McClimans v. Board of Supervisors of Shenango Township,* 107 Pa.Cmwlth. 542, 529 A.2d 562, 569 n. 4 (Pa.Cmwlth.1987) (*McClimans I* ). It is undisputed that the petitioners in this case have other uses for their properties, including the sale of oil and gas rights, the sale of timber, and the sale of land for residential and other uses. The petitioners have therefore failed to adduce any evidence of a taking under federal law. *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Keystone Bituminous Coal Association v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). The petitioners' reliance on *Lucas, supra,* is misplaced, because in that case the court found that the property owners had been deprived of all beneficial uses of their beachfront lots.

board of viewers before the appropriate court of common pleas. *See Gold v. Summit Township,* 660 A.2d 215 (Pa.Cmwlth.1995), *petition for allowance of appeal granted,* 544 Pa. 616, 674 A.2d 1077 (1996) and *appeal dismissed,* 548 Pa. 60, 694 A.2d 342 (1997).

We note, however, without deciding this issue, that our Supreme Court in *Miller & Son Paving, Inc. v. Plumstead Township, supra,* recently ad-

dressed whether property was temporarily taken when landowners were prevented from using their land for a limited time until a zoning ordinance was amended. There, Miller owned property in an R1 residential district that he wanted to use for quarrying, a use not permitted in that zone. The Court held there was no temporary taking of the land because it still had other viable uses as a residential property.

The petitioners also claim a taking under state law. This claim is based on the notion that the Commonwealth must pay for every ounce of coal they are unable to mine, regardless of the merit of the regulation. But in the petitioners' brief, p. 10, they say:

> Prior to the designation of the UFM area, all of the mineable and marketable coal situated in the applicable area was considered permittable, **excluding the usual barrier areas required for streams, dams, dwellings, highways, etc.** (Emphasis supplied.)

The question therefore arises why the Commonwealth cannot designate a "barrier" area to preserve the quality and quantity of the water in this watershed.

The petitioners rely upon *McClimans I, supra,* and *Board of Supervisors of Shenango Twp. v. McClimans,* 142 Pa.Cmwlth. 470, 597 A.2d 738 (Pa.Cmwlth.1991) (*McClimans II*), to prove a taking under state law. In *McClimans I,* our Court said that a zoning ordinance's exclusion of mining on the surface is a compensable taking of the coal estate below if the ordinance conclusively prevents an owner from gaining access to his subsurface property.

However, in *Miller, supra,* our Pennsylvania Supreme Court characterized this statement as dicta, and held that in order to be a compensable taking, the ordinance must be unduly oppressive and deprive the owner of all beneficial use of its property, which is basically the holding in *Lucas.*

In *Keystone,* where the parties had stipulated that enforcement of the Pennsylvania law would require the petitioners to leave approximately 27 million tons of coal in place, in upholding the law, the United States Supreme Court said:

> When the coal that must remain beneath the ground is viewed in the context of any reasonable unit of petitioners' coal mining operations and financially backed expectations, it is plain that the petitioners have not come close to satisfying their burden of proving that they have been denied the economically viable use of that property. The record indicates that only about 75% of petitioners' underground coal can be profitably mined in any event, and there is no showing that petitioners' reasonable 'investment–backed expectations' have been materially affected by the additional duty to retain the small percentage that must be used to support the structures protected by § 4.

480 U.S. at 497, 107 S.Ct. 1232.

In this case the petitioner, Erickson/Naughton, has adduced evidence that only 27 acres of its total 1350 acres, or 2% of its coal property in Clearfield County have been affected by the Goss Run UFM designation. The petitioner, Machipongo, has asserted only 157 acres of its 2037 acres, or 8% of its total property has been affected. The petitioners both assert they do not know what purchase price was paid for their land, and have adduced no evidence that their reasonable investment backed expectations have been materially affected.

The petitioners have produced some evidence that the value of their property has been reduced. But mere reduction in value does not demonstrate a taking. *Penn Central, supra; Concrete Pipe & Products of California Inc. v. Construction Laborers Pension Trust,* 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993).

In the words of *Keystone,* the petitioners have not come close to adducing evidence that they have been denied the economically viable use of their property and, therefore, have failed to show that their property has been taken by the Commonwealth. In my opinion, the Commonwealth is entitled to summary judgment.